**CITY OF CINCINNATI, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 96–605C.

United States Court of Federal Claims.

Oct. 28, 1997.

---

John J. Williams, Assistant City Solicitor, Cincinnati, OH, with whom was Fay D. Dupuis, City Solicitor, attorneys of record for plaintiff.

Miguel A. Serrano, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, with whom were David M. Cohen, Director, Kirk T. Manhardt, Assistant Director, and the Assistant Attorney General, attorneys of record for defendant.

1. Ordinance 281 modified existing Chapter 720, "Storm Management Code" of the General Regulations of the Cincinnati Municipal Code, enacted as Ordinance 330 on August 1, 1984. The plain-

## OPINION

HORN, J.

This case comes before the court on the defendant's motion to dismiss, filed pursuant to Rule 12(b)(1) and Rule 12(b)(4) of the Rules of the United States Court of Federal Claims (RCFC). The defendant, the United States, is the owner of record of premises located at 4676 Columbia Parkway, Cincinnati, Ohio 45226. The National Institute of Occupational Safety and Health, a division of the United States Department of Health and Human Services, occupies the property. The plaintiff, the City of Cincinnati, alleges that pursuant to the city's Stormwater Management Code, the defendant was assessed $46,-189.96 in storm drainage service charges by the city, but has refused to pay. According to the plaintiff, on the date the complaint was filed, the defendant owed $61,073.60 for the assessed costs and their non-payment. As discussed below, the court grants the defendant's motion to dismiss the complaint because the storm drainage service charges levied against the United States by the City of Cincinnati constitute impermissible taxation of the federal government.

### FACTS

On June 19, 1985, the City of Cincinnati passed Ordinance 281–1985[1] to implement their Stormwater Management Code, with the intended purpose of enacting a "comprehensive drainage code consistent with the effective use, operation, management, maintenance and improvement of a stormwater management system." The relevant portion of Ordinance 281 provides:

### STORMWATER MANAGEMENT CODE

Sec. 720. Scope

The purpose of the stormwater management code contained in this chapter is to provide for effective management and financing of a stormwater system within the city, to provide mechanism for mitigating

tiff's complaint contains a typographical error, which referred to Ordinance 330 as having been enacted on August 1, 1994.

the damaging effects of uncontrolled and unplanned stormwater runoff, to improve the public health, safety and welfare by providing for the safe and efficient capture and conveyance of stormwater runoff and the correction of stormwater problems, to authorize the establishment and implementation of a master plan for storm drainage including design, coordination, construction, management, operation, maintenance, inspection and enforcement, to establish reasonable storm drainage service charges based on each property's contribution of stormwater runoff to the system and use and benefit of services and facilities and to encourage and facilitate urban water resources management techniques including detention of storm water run off, minimization of the need to construct storm sewers, and the enhancement of the environment. In order to accomplish such purpose a storm drainage service charge shall be made on each lot or parcel in the city....

The city's storm drainage service charges shall be fair and reasonable and bear a substantial relationship to the cost of providing service and facilities. Similar properties shall pay similar stormwater service charges. Charges shall reflect the area of each property and its intensity of development, since these factors bear directly on the peak rate of stormwater runoff. Rate studies shall be conducted periodically.

Stormwater costs shall be spread throughout the city, except where activities or facilities are clearly unusual and in excess of the normal level of service city-wide. Charges for residential properties of two or less dwelling units shall reflect the relatively uniform effect that residential development has on runoff. Large residential lots generally have a lower overall intensity of development than small residential lots because a lesser percentage of large lots is covered with hard surfaced area. The effect of large residential properties on stormwater runoff is lowered by less imperviousness. Multi-family residential properties having three or more dwelling [sic] units and properties in land uses other than residential shall pay in proportion to residential properties of two or less

dwelling units. Both relative area and intensity of development of other land uses shall be considered in setting rates.

An appeal and service charge adjustment process shall be employed to review stormwater charges when unusual circumstances exist which alter runoff characteristics or when either service or benefit varies from a normal condition or is of greater significance than contribution to runoff.

Cincinnati, Ohio, Ordinance 281–1985.

Ordinance 281 imposes a storm drainage service charge on the owner of each lot and parcel of land within the city. Cincinnati, Ohio, Ordinance 281 § 720–53. To determine the storm drainage service charge, each property is first classified into one of three classes, A, B or C, according to its square footage and its use as residential or commercial property. Class C properties include "Multi-family (3 families and more), Residential Property and Non–Residential Property." Cincinnati, Ohio, Ordinance 281 § 720–55. Each Class C property also is assigned an intensity of development factor (IDF), which identifies the property as in one of ten categories of land use, each with a corresponding numerical IDF. For example, undeveloped parcels are assigned an IDF of .00, while commercial parcels have an IDF of .85. Cincinnati, Ohio, Ordinance 281 § 720–57. In addition, properties also are assigned an area range number (ARN) according to their square footage. Cincinnati, Ohio, Ordinance 281 §§ 720–1–A3, 720–61. Once the IDF and ARN are determined, the monthly storm drainage service charge for a Class C property is calculated as follows:

Multiply the area range number (ARN) of each lot or parcel times the intensity of development factor (IDF) of each lot or parcel, which equals the equivalent runoff units (ERU). Multiply this figure times the monthly charge per equivalent runoff unit. This calculation may be phrased as follows:

ARN × IDG [sic] = ERU

ERU × ($) charge per ERU = *($) Monthly Storm Drainage Service Charge, Class C*

Cincinnati, Ohio, Ordinance 281 § 720–61(3) (emphasis in original).[2]

None of the filings submitted to the court offer calculations of how the City of Cincinnati computed the original $46,189.96 assessment on the federal government or how the city determined the $61,073.60 final assessment. Moreover, no copies of the assessment bills were attached by either party to any of the pleadings. From a review of Ordinance 281, however, the methodology of calculating the storm drainage service charges does not appear to have been based on actual service usage figures, but rather on a formula established in the ordinance, which utilizes the size of the property and the intensity of the property's development in its calculation.

### DISCUSSION

When considering a motion to dismiss, the court may consider all relevant evidence in order to resolve any disputes as to the truth of the jurisdictional facts alleged in the complaint. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). The court is required to decide any disputed facts which are relevant to the issue of jurisdiction. *Id.* The basic standards for weighing the evidence presented by the parties when evaluating a motion to dismiss for lack of jurisdiction, pursuant to RCFC 12(b)(1), and/or a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(4), have been articulated by the United States Supreme Court and the United States Court of Appeals for the Federal Circuit, as follows: "in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *accord Hamlet v. United States,* 873 F.2d 1414,

1416 (Fed.Cir.1989). The court must presume that the undisputed factual allegations included in the complaint by plaintiff are true. *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d at 746; *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977).

In deciding the defendant's motion to dismiss, the question presented to the court is whether the storm drainage service charges imposed pursuant to Ordinance 281 by the City of Cincinnati on the defendant as the property owner are user fees or taxes imposed on the federal government in violation of the Supremacy Clause of the United States Constitution. U.S. Const. art. VI, cl. 2; *see M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819).

The plaintiff alleges that this court has jurisdiction to hear the above-captioned case because, according to the City of Cincinnati, the storm drainage service provided to, and accepted by, the federal government created an implied-in-fact contract between itself and the federal government pursuant to 28 U.S.C. § 1491(a)(1) (1997).[3] In *Total Medical Management, Inc. v. United States,* 29 Fed.Cl. 296 (1993), the court wrote that "[s]o long as a contract has been properly alleged, as it has here, jurisdiction will generally exist." *Id.* at 299. Stated otherwise, "[t]he forum had jurisdiction to hear the matter in the first instance—that is, subject-matter jurisdiction existed—as long as the petitioner asserted nonfrivolous claims." *Spruill v. Merit Systems Protection Board,* 978 F.2d 679, 687–88 (Fed.Cir.1992).

In the above-captioned case, however, even if jurisdiction is proper, this court grants the defendant's motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(4). The storm drainage service charges assessed against the defendant pursuant to Ordinance 281 do not constitute fees for services, and, thus, do

---

**2.** The ERU is defined as:

"Equivalent runoff unit" shall mean a value based on the parameters used in the stormwater management utility rate structure which represents a unit of stormwater runoff. This value is used to facilitate comparison of the number of billing units of various properties.

Cincinnati, Ohio, Ordinance 281 § 720–1–E1.

**3.** An implied-in-fact contract exists so long as the parties' conduct indicates mutual assent, and there is a meeting of the minds and mutuality of intent. *See Janowsky v. United States,* 36 Fed.Cl. 148, 151–52 (1996).

not create an implied contract between the City of Cincinnati and the federal government. Rather, the charges assessed against the United States constitute an unconstitutional, local tax on the federal sovereign, in violation of Article VI, Clause 2 of the United States Constitution, which is based upon the size and the development intensity of the commercial property owned by the federal government, and not on the services actually used, See M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819).

As stated by the United States Supreme Court, "[i]t was settled many years ago that the property of the United States is exempt by the Constitution from taxation under the authority of the State [or municipality] so long as title remains in the United States." Lee v. Osceola & Little River Improvement Dist., 268 U.S. 643, 645, 45 S.Ct. 620, 620, 69 L.Ed. 1133 (1925) (citation omitted). The Supreme Court further explained in Mayo v. United States:

Since the United States is a government of delegated powers, none of which may be exercised throughout the Nation by any one state, it is necessary for uniformity that the laws of the United States be dominant over those of any state. Such dominancy is required also to avoid a breakdown of administration through possible conflicts arising from inconsistent requirements. The supremacy clause of the Constitution states this essential principle. Article VI. A corollary to this principle is that the activities of the Federal Government are free from regulation by any state. No other adjustment of competing enactments or legal principles is possible.

Mayo v. United States, 319 U.S. 441, 445, 63 S.Ct. 1137, 1139–40, 87 L.Ed. 1504 (1943) (footnote omitted).

Subsequently, the Supreme Court also wrote:

What the Court's cases leave room for, then, is the conclusion that tax immunity is appropriate in only one circumstance: when the levy falls on the United States itself, or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities, at least insofar as the activity being taxed is concerned. This view, we believe, comports with the principal purpose of the immunity doctrine, that of forestalling 'clashing sovereignty,' McCulloch v. Maryland, 4 Wheat., at 430, 4 L.Ed. 579, by preventing the States from laying demands directly on the Federal Government. See City of Detroit v. Murray Corp., 355 U.S. at 504–505, 78 S.Ct. at 491–92 (opinion of Frankfurter, J.).

United States v. New Mexico, 455 U.S. 720, 735, 102 S.Ct. 1373, 1383, 71 L.Ed.2d 580 (1982).

The difference between a tax and a fee for services (or user fees), has been articulated by the Supreme Court, as follows:

Taxation is a legislative function, and Congress, which is the sole organ for levying taxes, may act arbitrarily and disregard benefits bestowed by the Government on a taxpayer and go solely on ability to pay, based on property or income. A fee, however, is incident to a voluntary act, e.g., a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station. The public agency performing those services normally may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other members of society.

National Cable Television Assn. v. United States, 415 U.S. 336, 340–41, 94 S.Ct. 1146, 1148–49, 39 L.Ed.2d 370 (1974) (footnote omitted).

In United States v. City of Columbia, Missouri, the Eighth Circuit affirmed the lower court's decision that the federal government was obliged to pay fees for its electric and water usage to the city-owned utility company as the charges arose from "its consensual purchase of the City's property." United States v. City of Columbia, Missouri, 914 F.2d 151, 155–56 (8th Cir.1990). The Eighth Circuit Court of Appeals reasoned that:

[This obligation] does not arise automatically, as does tax liability, from the United States' status as a property owner, resident, or income earner. When the United States purchases water, electricity, and related services, and then pays the utility

bill, it does so as a vendee pursuant to its voluntary, contractual relationship with the City. The City imposes the charge not in its capacity as a sovereign, but as a vendor of goods and services.

*Id.*

On the other hand, "[a]ssessments upon property for local improvements are involuntary exactions, and in that respect stand on the same footing with ordinary taxes." *Hagar v. Reclamation Dist. No. 108*, 111 U.S. 701, 707, 4 S.Ct. 663, 666–67, 28 L.Ed. 569 (1884). Such tax assessments are charges based, not upon voluntary requests for and the value of benefits bestowed, but upon the mere fact of property ownership. For example, the Comptroller General cited a decision by the New York State Court of Appeals that rejected the City of New York's practice of charging the United States for water based upon a "uniform scale of rates and charges for supplying water to different classes of buildings in the city with reference to their dimensions, value, exposure, use, etc." Comp. Gen. Dec. B–12425, 20 Comp. Gen. 206, 207 (1940) (citing *New York University v. American Book Co.*, 197 N.Y. 294, 90 N.E. 819 (1910)). As quoted in the Comptroller General's decision, the New York Court of Appeals found that, "[t]he rates so imposed must be paid regardless of the quantity of water used, or whether any water is used. *Such a rate is a tax, ... and the obligation to pay it is created by the exercise of the taxing power of the local authorities.*" *Id.* (citations omitted) (emphasis in original).

In *United States v. City of Huntington, West Virginia*, the United States Court of Appeals for the Fourth Circuit concluded that a city ordinance imposing a "fire service fee" and a "flood protection fee" on the United States, premised "on the basis of square footage of the buildings" was a tax, and not a user fee. *United States v. City of Huntington, West Virginia*, 999 F.2d 71, 72–73 (4th Cir.1993). The court found that "[l]iability for the 'user fee' charged by the City arises from the General Services Administration's and United States Postal Service's status as property owners and not from their use of a city service." *Id.* at 74. The court wrote:

The United States must pay reasonable user fees. For instance, charges for services from city-owned utilities are clearly fees for which the federal government would be liable to the same extent as any other customer. *See United States v. Harford County Md.*, 572 F.Supp. 239, 241 (D.Md.1983) ('The federal government has ... recognized its obligation to pay state or county charges based on the *quantum* of water or sewer services rendered.') But not every assessment tied to some state-provided benefit is a user fee.

\*      \*      \*

User fees are payments given in return for a government-provided benefit. Taxes, on the other hand, are 'enforced contribution[s] for the support of government.' *United States v. La Franca*, 282 U.S. 568, 572, 51 S.Ct. 278, 280, 75 L.Ed. 551 (1931).

*Id.* at 73–74 (emphasis in original).

It may be permissible for a city to assess the federal government for storm drainage service charges when the charge is based upon the government's actual use of the services. For example, unlike in the case at bar, the City of Seattle established its sewage system as a public utility and collected a sewage surcharge based upon the amount of water used by the owners of property. The Comptroller General found that it was legitimate for the city to treat its sewage system as a public utility, and to levy service charges against the United States. Comp. Gen. Dec. B–150193, 42 Comp. Gen. 246 (1962).

However, "[w]here a federal right is concerned we are not bound by the characterization given to a state tax by state courts or legislatures, or relieved by it from the duty of considering the real nature of the tax and its effect upon the federal right asserted." *Carpenter v. Shaw*, 280 U.S. 363, 367–68, 50 S.Ct. 121, 123, 74 L.Ed. 478 (1930) (citations omitted). Cincinnati's Ordinance 281 describes the goals of the Stormwater Management Code as establishing "reasonable storm drainage service charges based on each property's contribution of stormwater runoff to the system and use and benefit of services and facilities...." Cincinnati, Ohio, Ordinance 281 § 720. The same ordinance, however, also states that:

The city's storm drainage service charges shall be fair and reasonable and bear a *substantial relationship* to the cost of providing service and facilities. *Similar properties shall pay similar stormwater service charges.* Charges shall reflect the area of each property and its intensity of development, since these factors bear directly on the peak rate of storm water runoff. Rate studies shall be conducted periodically.

*Id.* (emphasis added).

Therefore, after a review of Ordinance 281, and the facts presented in the case at bar, the court concludes that the charges assessed against the plaintiff for storm drainage service charges are analogous to the municipal service charges exacted by the City of Huntington and the City of New York in the cases discussed above, because the City of Cincinnati calculates and levies the storm drainage service charge regardless of the actual amount of runoff from the government's property. Under the system enacted by the City of Cincinnati, during a month of drought or a month of flooding, the federal government would be assessed the same amount of storm drainage service charges. Although the formula in plaintiff's Stormwater Management Code for calculating the storm drainage service charge describes the charge as a "storm drainage service charge," establishes a goal of basing the charges on runoff and usage, and details component charges, ultimately, it is assessed by the City of Cincinnati as a charge estimated on the square footage of the government's property and on the intensity of the property's development. The plaintiff's storm drainage service charges, provided for in Ordinance 281, therefore, are not user fees based on actual use, and cannot result in an implied-in-fact contract between the City of Cincinnati and the federal government. As a tax on the federal sovereign, the storm drainage service charges assessed against the United States by the City of Cincinnati cannot present a valid basis for a claim in this court.

## CONCLUSION

The court, therefore, **DISMISSES** the above-captioned case for failure to state a claim upon which relief can be granted. The defendant's motion to dismiss is, hereby, **GRANTED.**

**IT IS SO ORDERED.**