# In the United States Court of Federal Claims

No. 11-761 C

(Filed January 28, 2013)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * | | Money-Mandating Source of Law; |
| DEKALB COUNTY, GEORGIA, | * | Tucker Act, 28 U.S.C. § 1491(a)(1) |
| a political subdivision of the | * | (2006); Statute of Limitations, |
| State of Georgia, | * | 28 U.S.C. § 2501 (2006); |
| | * | Waiver of Sovereign Immunity; |
| *Plaintiff,* | * | State Taxation of Federal Property; |
| | * | Supremacy Clause, U.S. Const. |
| v. | * | Art. VI, cl. 2; Federal Facilities |
| | * | Section of the Clean Water Act, |
| THE UNITED STATES, | * | 33 U.S.C. § 1323 (2006); Subject |
| | * | Matter Jurisdiction, RCFC 12(b)(1); |
| *Defendant.* | * | Failure to State a Claim, |
| * * * * * * * * * * * * * * * * * * * * | | RCFC 12(b)(6). |

*Sam L. Brannen, Jr.*, DeKalb County Law Department, with whom were *Lisa E. Chang* and *Duane D. Pritchett*, Decatur, GA, for plaintiff.

*Franklin E. White, Jr.*, United States Department of Justice, with whom were *Stuart F. Delery*, Acting Assistant Attorney General, and *Jeanne E. Davidson*, Director, Washington, DC, for defendant. *Harold Askins*, Department of Veterans Affairs, *Michael F. Kiely*, United States Postal Service, *James Misrahi*, Department of Health & Human Services, Centers for Disease Control, of counsel.

*Lawrence R. Liebesman*, Washington, DC, for *amici curiae* National Association of Clean Water Agencies, National Association of Flood and Stormwater Management Agencies, and American Public Works Association.

————————————————

## OPINION

————————————————

**BUSH,** *Judge.*

Now pending before the court is defendant's motion to dismiss and plaintiff DeKalb County's motion for summary judgment, both of which have been fully briefed and are ripe for a decision by the court. Because the court concludes that some of the claims set forth in the complaint were filed more than six years after they first accrued, defendant's motion to dismiss those claims under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC) must be granted. The court further holds that the remainder of the claims set forth in the complaint fail to state a claim upon which relief can be granted and must be dismissed under RCFC 12(b)(6). Accordingly, defendant's motion to dismiss is granted, and DeKalb County's motion for summary judgment is denied.

## BACKGROUND[1]

### I.    Factual History

#### A.    The DeKalb County Municipal Separate Storm Sewer System

Most of the rain that falls on undeveloped land is absorbed into the ground. But when land is developed, and the property is covered with impervious surfaces such as buildings, parking lots, sidewalks, and roads, rainfall cannot be absorbed and flows onto adjacent land in higher volumes and at higher velocities than if the land had remained in an undeveloped state. This additional runoff increases the risk of flooding for nearby properties and also contributes to water pollution because the stormwater collects debris, chemicals, and other materials on the pavement and other impervious surfaces as it travels towards natural waterways. Stormwater runoff from impervious surfaces also impairs water quality through erosion and sedimentation.

In response to the increased stormwater runoff attributable to development, local governments have constructed and operated stormwater management systems for many years. The cost of operating such systems has increased dramatically in recent years, due to the accelerated pace of development and new requirements, especially requirements related to the abatement of water pollution, imposed by both state and federal law. While drainage and flood prevention were the primary

---

[1] The facts recounted here are taken from the parties' submissions in this case and are undisputed. Unless otherwise noted, the court makes no findings of fact in this opinion.

2

impetus for the development of stormwater management systems, environmental protection has become an increasingly important – perhaps the primary – consideration in the design and management of such systems.

The Federal Water Pollution Control Act Amendments of 1972, Pub. L. No. 92-500, 86 Stat. 816, more commonly known as the Clean Water Act (CWA), created the National Pollutant Discharge Elimination System (NPDES), which requires a permit from either the Environmental Protection Agency (EPA), or an EPA-approved state agency, in order to discharge any type of pollutant from a point source into the waters of the United States. *See* 33 U.S.C. §§ 1311(a), 1342 (2006). In enacting the CWA, Congress declared that the statute's purpose was "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 86 Stat. 816. Further, "it [was] the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution." *Id.*

In general, municipal separate storm sewer systems divert and collect stormwater and then discharge that water, untreated, into natural waterways. Because those systems discharge pollutants into the waters of the United States, they are treated as point sources under the CWA, as amended, and are required to obtain an NPDES permit, which imposes stringent requirements on their design and operation.[2] *See* 33 U.S.C. § 1342(p)(3)(B) (stating that NPDES permits for municipal storm sewers must prohibit the discharge of anything other than stormwater into the system and "shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the state determines appropriate for the control of such pollutants").

DeKalb County, Georgia (the County), a political subdivision of the State of Georgia, owns and operates the DeKalb County Municipal Separate Storm Sewer System (the stormwater management system), which was developed over many

---

[2] There was no NPDES permit requirement for stormwater discharges until Congress passed the Water Quality Act of 1987, Pub. L. No. 100-4, sec. 405, 101 Stat. 7, 69-71. The EPA promulgated the first regulations implementing the new requirement in 1990. National Pollutant Discharge Elimination System Permit Application Regulations for Storm Water Discharges, 55 Fed. Reg. 47,990 (Nov. 16, 1990) (codified at 40 C.F.R. pts. 122-124).

years.[3]  Code of DeKalb County (County Code) § 25-360(c).  The system is operated in accordance with an NPDES permit issued by the State of Georgia and is also subject to additional requirements under state law.  *See* Compl. ¶ 13; Pl.'s Resp. at 1-2.

In December 2003, the County's board of commissioners adopted a new stormwater management ordinance, which created a new stormwater utility that would be "responsible for stormwater management throughout the county's jurisdictional limits, and [would] provide for the management, protection, control, regulation, use, and enhancement of stormwater systems and facilities."  County Code § 25-362(a).  The board of commissioners transferred to the new stormwater utility "operational control over the existing stormwater management systems and facilities owned and heretofore operated by the county and other related assets, including but not limited to properties upon which such facilities are located, easements, rights-of-entry and access, and certain equipment."  *Id.* § 25-362(b).  Most relevant to this case, the stormwater ordinance established a new system of "stormwater service fees" to fund the operations of the new utility.  *Id.* § 25-365.

Under the ordinance, the owners of all developed property located within the unincorporated portions of the county are required to pay an annual assessment that is generally based on the impervious surface area located on the property.[4]  The charge assessed on developed properties is equal to $4.00 per month for each

---

[3] The County is authorized to establish a stormwater management system under the Home Rule section of the Georgia Constitution.  *See* Ga. Const. 1983, Art. IX, sec. 2, par. III (a)(6) (stating that counties may provide "[s]torm water and sewage collection and disposal systems").  Under state statute, the County is authorized to "prescribe, revise, and collect rates, fees, tolls, or charges" for systems, plants, works, instrumentalities, and properties "used or useful in connection with the collection, treatment, and disposal of sewage, waste, and storm water."  Ga. Code Ann. §§ 36-82-61(4)(C)(ii), 36-82-62(a)(3) (West 2012).

[4] The ordinance applies only to the unincorporated portions of DeKalb County because the County cannot exercise its authority within the boundaries of incorporated municipalities that are located inside of its borders.  *See* Ga. Const. 1983, Art. IX, sec. 2, par. III(b)(1) ("No county may exercise any of the powers listed in subparagraph (a) of this Paragraph or provide any service listed therein inside the boundaries of any municipality or any other county except by contract with the municipality or county affected[.]").

Equivalent Residential Unit (ERU).[5]  *Id.* § 25-365(b).  Single-family dwellings are assessed the rate applicable to one ERU; multiple-family dwellings are assessed the rate applicable to one ERU, multiplied by the number of dwelling units on the property, multiplied by an adjustment factor of 0.5; and all other developed properties are assessed the rate applicable to one ERU for every 3000 square feet of impervious surface area on the property, rounded up to the next highest tenth of an ERU.  *Id.* § 25-365(c)-(e).

The stormwater management charges do not apply to undeveloped land, public rights of way, railroad rights of way, or "[a]ny property whereby one hundred (100) percent of the stormwater runoff is contained on the premises and no runoff enters into the stormwater management system."  *Id.* § 25-368.  Further, property owners may apply for credits against the stormwater assessment by implementing specified systems and facilities on their own property, but the credits may amount to no more than forty percent of the total charge.  *Id.* § 25-369(a).

The ordinance provides that the revenue generated by the new assessments must be deposited into an "enterprise fund," which is to be used only for costs incurred in connection with the stormwater management system.  County Code § 25-364.  Under the ordinance, the County may appropriate additional funds for the system, but the revenue in the enterprise fund may not be devoted to any other purpose.  While revenue that is deposited into the enterprise fund may be pledged "to the payment of principal of premium, if any, and interest on any revenue bonds or other obligations lawfully issued or otherwise contracted for by the county as may be provided in any resolution authorizing such bonds or obligations or in any trust instrument relating to such bonds or obligations[,]" *id.* § 25-364(c), the referenced bonds are limited to those related solely to the stormwater management system, *see* Tr. at 35-36.

The ordinance provides that the "stormwater service fee shall accrue beginning January 1, 2004, and shall be billed annually thereafter."  *Id.* § 25-366.  The charge may be billed separately or collected "with other fees for services, . . . provided that in no instance shall the service charge constitute a direct lien against the property."  *Id.* § 25-371(a).  The County may send the bill for the assessment

---

[5]/  The ERU was calculated based on the county's median impervious coverage for a statistical sampling of lots improved with detached, single-family dwellings.  *See* County Code § 25-361 (definition of "Equivalent Residential Unit").

through the mail or by other means, and that bill must indicate "the amount of the bill, the date the payment is due, and the date when past due." *Id.* § 25-371(b).

In practice, the County often includes the amount of the stormwater charge due for each property owner as a line item on the annual bill sent during the summer for fees and ad valorem taxes. Affidavit of John G. Booth (Booth Aff.) ¶ 6. The United States and other tax-exempt property owners, in contrast, are billed for the assessment on a separate "Stormwater Utility Notice." *Id.* The County assesses these charges against its own property, and also pays stormwater management charges imposed by municipalities and other counties in which it owns property. *See* Affidavit of Joel Gottlieb ¶¶ 3-5.

## B.      The Federal Facilities Section of the Clean Water Act

Since its original enactment in 1972, the CWA has included a provision known as the Federal Facilities Section, 33 U.S.C. § 1323 (2006), which requires the federal government to meet the same water pollution abatement requirements as those applicable to private entities.[6] In this case, the County argues that the Federal Facilities Section, which was amended in 1977 and again in 2011, waives the federal government's sovereign immunity from the stormwater utility charges that plaintiff seeks to recover in this case. Because the Federal Facilities Section is central to the County's case, the court will examine its history in some detail.

### 1.      The 1972 Version

In the Federal Water Pollution Control Act Amendments of 1972, the relevant portion of the Federal Facilities Section read as follows:

> Each department, agency, or instrumentality of the
> executive, legislative, and judicial branches of the
> Federal Government (1) having jurisdiction over any
> property or facility, or (2) engaged in any activity

---

[6] The various sections of the CWA are often referred to as they appeared in the law enacted by Congress, rather than as they were ultimately codified in the United States Code. The Federal Facilities Section, for example, is sometimes referred to as section 313 of the CWA, even though it is codified at 33 U.S.C. § 1323. In this opinion, the court will refer to that section as it was codified (*i.e.*, as "section 1323").

> resulting, or which may result, in the discharge or runoff
> of pollutants shall comply with Federal, State, interstate,
> and local requirements respecting control and abatement
> of pollution to the same extent that any person is subject
> to such requirements, including the payment of
> reasonable service charges.

Pub. L. No. 92-500, 86 Stat. 816, 875.

The Senate Report on the 1972 CWA states that the purpose of section 1323 was to "require[] that Federal facilities meet the same effluent limitations as private sources of pollution, unless the Federal facility is specifically exempted by the President." S. Rep. No. 92-414, at 67, *reprinted in* 1971 U.S.C.C.A.N. 3668, 3733. There is no discussion in either the text of the statute or in the Senate Report as to what types of charges the term "reasonable service charges" was intended to encompass.

## 2. The 1977 Version

In *EPA v. California EPA ex rel. State Water Resources Control Board*, 426 U.S. 200 (1976), the Supreme Court held that the Federal Facilities Section of the CWA did not require federal agencies to meet state permitting requirements related to the abatement of water pollution. The Supreme Court first explained that federal properties "are subject to state regulation only when and to the extent that congressional authorization is clear and unambiguous." *Id.* at 211. Next, the Court held that section 1323 did not expressly require federal agencies to obtain an NPDES permit from the state to discharge effluents into navigable waters. Finally, according to the Court, none of the express terms of section 1323 – including the requirement that the federal government pay reasonable service charges – could be read to contain an implied requirement to obtain such a permit.

Congress amended section 1323 in 1977, noting in the Senate Report on the amendment that "[t]he act has been amended to indicate unequivocally that all Federal facilities and activities are subject to all of the provisions of State and local pollution laws." S. Rep. No. 95-370, at 67 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4326, 4392. The report explains that "the Supreme Court, encouraged by Federal agencies, ha[d] misconstrued the original intent [of the 1972 law]." *Id.* The report further notes that because

7

the substantive requirements of the act and of State and local law would be unenforceable unless procedural provisions were also met[,] section 313 is amended to specify that, as in the case of air pollution, a Federal facility is subject to any Federal, State, and local requirement respecting the control or abatement of water pollution, both substantive and procedural, to the same extent as any person is subject to these requirements. This includes, but is not limited to, requirements to obtain operating and construction permits, reporting and monitoring requirements, any provisions for injunctive relief and such sanctions imposed by a court to enforce such relief, and the payment of reasonable service charges.

*Id.* at 4392-93. Section 1323, as amended in 1977 and as it still reads today, states that

[e]ach department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants, *and each officer, agent, or employee thereof in the performance of his official duties*, shall *be subject to*, and comply with, *all* Federal, State, interstate, and local requirements, *administrative authority, and process and sanctions* respecting *the* control and abatement of water pollution *in the same manner, and* to the same extent as *any nongovernmental entity* including the payment of reasonable service charges.

33 U.S.C. § 1323(a) (emphasis added to indicate changes made by amendment). The amended section also states that its mandate applies "to any requirement, whether substantive or procedural," "to the exercise of any Federal, State, or local administrative authority," and "to any process and sanction, whether enforced in Federal, state, or local courts or in any other matter." *Id.* Finally, the 1977 version of section 1323 states that "[t]his subsection shall apply notwithstanding any

immunity of such agencies, officers, agents, or employees under any law or rule of law." *Id.*

### 3. The 2011 Version

Despite the 1977 amendment to the Federal Facilities Section of the CWA, the federal government routinely refused to pay the types of stormwater charges at issue in this case, arguing that such charges were taxes rather than fees, and did not fall within the waiver of immunity contained in section 1323(a). In response, Senator Ben Cardin introduced a bill to add two new subsections to section 1323, without changing the text of section 1323(a):

> (c) Federal Responsibility for Stormwater Pollution. Reasonable service charges described in subsection (a) include reasonable fees or assessments made for the purpose of stormwater management in the same manner and to the same extent as any nongovernmental entity.
>
> (d) No Treatment as Tax or Levy. A fee or assessment described in this section –
>
> > (1) shall not be considered to be a tax or other levy subject to an assertion of sovereign immunity; and
> >
> > (2) may be paid using appropriated funds.

S. 3481, 111th Cong. (2010) (as introduced), 156 Cong. Rec. S4851, S4856.

In introducing his proposed amendment to the Federal Facilities Section, Senator Cardin noted the government's persistent refusal to pay reasonable stormwater management charges, and explained that "[a]dopting the legislation that I am introducing today will remove all ambiguity about the responsibility of the Federal Government to pay these normal and customary stormwater fees." 156 Cong. Rec. S4851, S4856 (2010) (statement of Senator Cardin).

Congress ultimately passed an amended version of Senator Cardin's bill,

9

which the President signed into law on January 4, 2011:

> (c)     Reasonable Service Charges –
>
> (1)     In general.  For the purposes of this Act, reasonable service charges described in subsection (a) include any reasonable nondiscriminatory fee, charge, or assessment that is –
>
>> (A)     based on some fair approximation of the proportionate contribution of the property or facility to stormwater pollution (in terms of quantities of pollutants, or volume or rate of stormwater discharge or runoff from the property or facility); and
>>
>> (B)     used to pay or reimburse the costs associated with any stormwater management program (whether associated with a separate storm sewer system or a sewer system that manages a combination of stormwater and sanitary waste), including the full range of programmatic and structural costs attributable to collecting stormwater, reducing pollutants in stormwater, and reducing the volume and rate of stormwater discharge, regardless of whether that reasonable fee, charge, or assessment is denominated a tax.

Pub. L. No. 111-378, 124 Stat. 4128 (2011).  In addition, the amendment stated that federal agencies "shall not be obligated to pay or reimburse any fee, charge, or assessment described in paragraph (1), except to the extent and in an amount provided in advance by any appropriations Act to pay or reimburse the fee, charge, or assessment." *Id.* at 4128-29.

### C. The Federal Properties in this Case

The United States owns a number of properties located within the county. In this case, the County seeks to recover unpaid stormwater management charges assessed against eighteen different properties – six owned by the United States and twelve owned by the Postal Service – for the years 2005 through 2010. Plaintiff asserts that the government has been inconsistent in its payment of stormwater management charges for its properties, "paying the fees in full for some properties and facilities and refusing to pay for other similar properties and facilities." Compl. ¶ 27. The County has demanded payment of the charges for many years, and notified the government of its intent to pursue its claims in court in letters dated March 9, 2010 and October 13, 2011. *Id.* ¶¶ 28-29.

The government concedes that it is now required, under section 1323, to pay all stormwater management charges accruing after January 4, 2011, the date of the most recent amendment to that section.[7] In this case, the parties do not dispute whether the government is required to pay those charges now and in the future. Rather, the parties' disagreement here centers on whether the government is liable to the County for charges that were assessed against federal properties in the years 2005 through 2010.

## II. Procedural History

On November 14, 2011, the County filed its complaint in this case, in which it argues that the federal government has waived its sovereign immunity from "reasonable service charges" under section 1323 of the Clean Water Act, and that the stormwater management charges plaintiff seeks to recover in this case are within the scope of that waiver. The County requests $281,553.12 in damages, plus interest, attorneys' fees, and other related expenses. The amount requested by the County is limited to charges that accrued before section 1323 was amended on

---

[7] While the government concedes that the 2011 amendment of section 1323 created a prospective obligation to pay the County's stormwater management charges, there is some uncertainty with respect to the government's diligence in making those payments. *Compare* Pl.'s Resp. at 16 n.9 (stating that the United States has "paid the majority of such fees incurred since § 1323(c) became law on January 4, 2011") *with* Booth Aff. ¶ 9 ("No [fewer] than fifteen (15) federal facilities are now delinquent in paying stormwater utility fees due DeKalb County for calendar year 2011.").

11

January 4, 2011.

On February 27, 2012, the government filed a motion to dismiss this action pursuant to RCFC 12(b)(1) and RCFC 12(b)(6).  Defendant raises two arguments in its motion to dismiss.  First, defendant argues that any claims that accrued before November 14, 2005 must be dismissed as untimely under 28 U.S.C. § 2501 (2006).  Second, defendant asserts that each of the County's remaining claims must be dismissed for failure to state a claim because those claims seek the recovery of state taxes that were levied upon federal properties before the United States waived its immunity from such taxes.

On April 30, 2012, the County filed its response to the government's motion to dismiss, as well as a motion for partial summary judgment in favor of plaintiff.  In response to defendant's argument that some of the County's claims were not timely, plaintiff asserts that its stormwater management charges are not due until December 31st of each year, and do not become delinquent until January 1st of the following year.  For that reason, plaintiff argues that none of its claims accrued before January 1, 2006, which was less than six years before it filed its suit in this court.  With respect to defendant's argument that the County's charges are impermissible taxes that were not covered by the pre-2011 version of section 1323, plaintiff responds that its charges are not taxes but fees, which fall squarely within the waiver of sovereign immunity contained in section 1323.

On May 7, 2012, the National Association of Clean Water Agencies, the National Association of Flood and Stormwater Management Agencies, and the American Public Works Association filed a motion for leave of the court to file an *amicus curiae* brief in support of the County.  The court granted that motion on May 15, 2012.  In their brief, amici argue that the 2011 amendment should not be read to contain a new waiver of the government's sovereign immunity.  Instead, according to amici, the 2011 amendment must be viewed as a mere clarification of the waiver of sovereign immunity contained in the earlier version of section 1323.  For that reason, amici contend that the government is liable for the charges that accrued before the 2011 amendment was enacted.

On July 20, 2012, defendant filed a reply in support of its motion to dismiss, as well as its response to the County's motion for summary judgment.  In its reply, the government rejects the County's contention that none of the charges assessed in 2005 accrued until January 1, 2006.  In that regard, the government notes that the

County sent the government an invoice for approximately half of those charges in the summer of 2005, and that the invoice informed the government that the charges were due no later than August 15, 2005. For that reason, the government argues that any claims related to those charges accrued more than six years before the complaint was filed in this case. The government further asserts that the charges at issue in this case are taxes rather than fees, that the government had not waived its immunity from such taxes until January 2011, and that the 2011 amendment cannot be read as a clarification of an earlier waiver of immunity.

On September 25, 2012, the County filed its reply in support of its motion for summary judgment. In its reply, the County disagrees with the legal tests endorsed by the government in its motion, but further argues that its stormwater utility charges are fees irrespective of which test is applied. The County also endorses and adopts the principal argument advanced by amici in their brief, *i.e.*, that the 2011 amendment to section 1323 may be applied retroactively as a clarification of the earlier version of that section.

This matter was transferred to the undersigned pursuant to RCFC 40.1 on October 17, 2012, and the court heard oral argument from counsel on the parties' dispositive motions on November 30, 2012.[8]

## DISCUSSION

### I.    Standards of Review

#### A.    RCFC 12(b)(1)

In rendering a decision on a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), this court must presume all undisputed factual allegations to be true and must construe all reasonable inferences in favor of the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 814-15 (1982); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988). The relevant issue in a motion to dismiss under RCFC 12(b)(1) "'is not whether a plaintiff will

---

[8]/ With the court's permission, counsel for the County yielded a portion of his time for oral argument to counsel for amici.

13

ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Patton v. United States*, 64 Fed. Cl. 768, 773 (2005) (quoting *Scheuer*, 416 U.S. at 236). The plaintiff bears the burden of establishing subject matter jurisdiction, *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936)), and must do so by a preponderance of the evidence, *Reynolds*, 846 F.2d at 748 (citations omitted). The court may look at evidence outside of the pleadings in order to determine its jurisdiction over a case. *Martinez v. United States*, 48 Fed. Cl. 851, 857 (2001) (citing *RHI Holdings, Inc. v. United States*, 142 F.3d 1459, 1461-62 (Fed. Cir. 1998); *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991)), *aff'd in relevant part*, 281 F.3d 1376 (Fed. Cir. 2002). "Indeed, the court may, and often must, find facts on its own." *Id.* If jurisdiction is found to be lacking, this court must dismiss the action. RCFC 12(h)(3).

## B.   RCFC 12(b)(6)

It is well-settled that a complaint should be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). When considering a motion to dismiss under this rule, "the allegations of the complaint should be construed favorably to the pleader." *Scheuer*, 416 U.S. at 236. "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief," dismissal is warranted under RCFC 12(b)(6). *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007). To survive a motion to dismiss for failure to state a claim, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. While a complaint is not required to contain detailed factual allegations, it must provide "enough facts to state a claim for relief that is plausible on its face." *Id.* at 570. In order to meet the requirement of facial plausibility, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## II.   Analysis

In its motion, defendant advances two separate grounds for dismissing the claims set forth in the County's complaint. First, defendant argues that any claims related to stormwater utility charges that were billed to the government more than

14

six years before the complaint was filed are precluded by the court's statute of limitations and must be dismissed under RCFC 12(b)(1). Second, defendant asserts that the remaining claims must be dismissed under RCFC 12(b)(6) because (1) the County's assessments constitute taxes; (2) the government did not waive its immunity from state or local taxes used to fund stormwater management systems until January 4, 2011; and (3) that waiver may not be applied retroactively to cover stormwater utility charges that were levied before that date.

The court must first address the County's assertion that defendant's motion to dismiss must be converted into a motion for summary judgment because it relies on material outside of the pleadings. That assertion is incorrect for three reasons. First, the court is not required to convert a motion to dismiss into a motion for summary judgment unless the court relies upon evidence outside of the pleadings in resolving the motion. *See* RCFC 12(d) (requiring conversion only when "matters outside the pleadings are presented to *and not excluded by the court*") (emphasis added). Neither of the documents attached to the government's motion to dismiss is necessary to the court's resolution of that motion.

Furthermore, to the extent that the court must rely on any material outside of the pleadings in this case, such reliance is limited to the government's motion to dismiss under RCFC 12(b)(1). The requirement set forth in RCFC 12(d) – *i.e.*, that motions to dismiss must be treated as motions for summary judgment when the court relies on evidence outside of the pleadings – is, by its own terms, limited to motions to dismiss under RCFC 12(b)(6) and RCFC 12(c). In resolving motions to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1), in contrast, the court is free to make findings of fact based on evidence not contained in the pleadings. *See Rocovich*, 933 F.2d at 993; *Martinez*, 48 Fed. Cl. at 857.

Finally, both of the documents attached to the government's motion to dismiss are matters of public record that were printed from the County's own website. The court may consider those documents in resolving the motion to dismiss without converting that motion into one for summary judgment. *See Sebastian v. United States*, 185 F.3d 1368, 1374 (Fed. Cir. 1999) ("In deciding whether to dismiss a complaint under Rule 12(b)(6), the court may consider matters of public record.").

15

**A.      Motion to Dismiss for Lack of Subject Matter Jurisdiction**

In its motion to dismiss, defendant argues that this court does not have jurisdiction over any claims for the recovery of stormwater utility charges that were billed to the government more than six years before the County filed its complaint in this case.  Because the complaint was filed on November 14, 2011, defendant argues that the County's attempt to recoup unpaid stormwater charges that were billed more than six years before that date are untimely under 28 U.S.C. § 2501.  Further, although the issue was not raised by defendant, the court must determine whether plaintiff has identified a money-mandating source of substantive law for purposes of this court's jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1) (2006).  For the reasons set forth below, the court holds that plaintiff has identified a money-mandating source of law, but further concludes that the County's claims to recover stormwater utility charges that were billed to the government before November 14, 2005 are untimely and must be dismissed under RCFC 12(b)(1).

**1.      The Court Does Not Possess Subject Matter Jurisdiction over Claims for the Recovery of Stormwater Utility Charges Billed to Defendant before November 14, 2005**

Section 2501 provides in relevant part that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."  28 U.S.C. § 2501.  The United States Supreme Court has held that the six-year limitations period is an absolute jurisdictional bar that cannot be waived by the government. *See John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133-34 (2008) (holding that the statute of limitations contained in section 2501 is jurisdictional and is not subject to tolling, waiver, or estoppel).  The County filed its suit on November 14, 2011.  In order to be considered within the limitations period set forth in section 2501, the County's claims must have accrued no earlier than November 14, 2005.  If any of its claims accrued before that date, then the court is without jurisdiction to hear them.  The Federal Circuit has explained that a claim first accrues for purposes of the six-year limitations period "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Alder Terrace*, 161 F.3d at 1377.

The County asserts that the stormwater management charges it levied on

16

federal properties in 2005 were not due until the end of that year and did not become delinquent until January 1, 2006. *See* Booth Aff. ¶ 5. In addition, the County contends that a claim seeking payment for services rendered accrues, and the statute of limitations begins to run, only when "'the last services are rendered.'" Pl.'s Resp. at 19 (quoting *Empire Inst. of Tailoring, Inc. v. United States*, 142 Ct. Cl. 165, 168 (1958)). Inasmuch as the charges for 2005 were based on services that plaintiff argues were rendered until December 31, 2005, the County contends that its claims related to the recovery of those charges were timely because they did not accrue more than six years before the complaint was filed in this case.

Defendant, in contrast, contends that under the continuing claims doctrine, "'the cause of action for pay or compensation accrues as soon as the payor fails or refuses to pay what the law (or the contract) requires; there is no other condition precedent to the accrual of the cause of action.'" Def.'s Reply at 7 (quoting *Friedman v. United States*, 310 F.2d 381, 385 (Ct. Cl. 1962)). Furthermore, according to defendant, "'where the payments are to be made periodically, each successive failure to make proper payment gives rise to a new claim upon which suit can be brought.'" *Id.* at 8 (citation omitted). The government received an invoice for stormwater management charges in the summer of 2005. On that invoice, the County stated that the stormwater utility charge is calculated on an annual basis, but is due in two equal installments on August 15, 2005, and November 15, 2005. *See* Booth Aff. Ex. 1. Based on that invoice, the government argues that any of the County's claims related to stormwater charges levied on federal properties in the first half of 2005 are untimely.[9]

The County does not dispute that it sent an invoice to the government for its charges in July 2005, *see* Tr. at 53, and that invoice expressly states that the charges "are due in two equal installments: August 15th and November 15th," Booth Aff. Ex. 1. The County argues, however, that the dates indicated on the

_____

[9]/ In its motion, defendant asserts that the County's stormwater management charges accrue on a continuous basis beginning on January 1st of each year. Based on that assertion, defendant argues that more than ten months' worth of the charges imposed on federal properties in 2005 are time-barred under section 2501. In its reply in support of its motion, however, the government appears to have abandoned that argument, instead asserting that the County's claims are untimely with respect to half of the stormwater management charges levied in 2005 – *i.e.*, those included on the July 2005 invoice.

invoice are not really due dates.  Rather, plaintiff contends those dates allow property owners to prepay their stormwater charges as an administrative convenience, but the charges were not actually due until December 31, 2005.  *Id.* ¶¶ 5-7.

The County's argument is not, however, supported by the record in this case.  Nothing in the stormwater ordinance states that stormwater management assessments are due on December 31st, or that they are not considered delinquent until January 1st of the following year.  Instead, the ordinance states that "[t]he stormwater service fee shall accrue beginning January 1, 2004, and shall be billed annually thereafter."  County Code § 25-366.  The ordinance also requires the County to inform property owners of the date on which the charges are due, and requires property owners to pay a one percent per month late fee for charges that are delinquent.[10]  *Id.* § 25-371(b).  The County sent the government an invoice for stormwater utility charges in July 2005, and that invoice unequivocally informed the government that half of its annual liability for those charges was due no later than August 15th of that year.  Because the government did not pay the assessments for the first half of 2005 by the specified date, the County could have commenced an action to recover those charges the next day, on August 16, 2005.  Thus, the deputy tax commissioner's statement that the charges were not actually delinquent until January 1st of the next year cannot override the August 15th deadline imposed by the County's invoice or suspend the accrual of the County's claims for purposes of the limitations period.  For the foregoing reasons, the court holds that any claims related to stormwater charges for the first half of 2005 were untimely and must be dismissed under RCFC 12(b)(1).

> **2.  Section 1323(a) of the Clean Water Act Is a Money-Mandating Source of Law for Purposes of this Court's Jurisdiction under the Tucker Act**

With respect to the remaining claims presented by plaintiff, in order to establish jurisdiction in this court, the County must demonstrate that the

---

[10]/ While the County describes the stormwater assessment as an annual charge, and the ordinance states that those charges shall be billed annually, *see* County Code § 25-366, the ordinance states that the charges are to be calculated on a *monthly*, rather than annual, basis, *see id.* § 25-365(b) ("The stormwater service charge per equivalent residential unit shall be four dollars ($4.00) per month or as amended by official action of the governing authority.").

government has consented to suit and that there is a substantive legal basis for such claims. *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (*White Mountain Apache*) ("Jurisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity, together with a claim falling within the terms of the waiver.") (citations omitted).

The County asserts that this court has jurisdiction over its claims under the Tucker Act,[11] which provides in relevant part that the

> United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). The Federal Circuit has explained that the Tucker Act "does two things: (1) it confers jurisdiction upon the Court of Federal Claims over the specified categories of actions brought against the United States, and (2) it waives the Government's sovereign immunity for those actions." *Fisher v.*

---

[11]/ The County also asserts that this court may exercise jurisdiction over suits against the Postal Service under 39 U.S.C. § 401 (2006). With respect to federal jurisdiction, however, that section simply provides that the Postal Service may "sue and be sued in its official name." *Id.* § 401(1). Another section of the same title addresses suits by and against the Postal Service, but that section states only that "the United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service." 39 U.S.C. § 409(a) (2006). Defendant does not contest this court's jurisdiction over the Postal Service under the Tucker Act, and this court routinely exercises such jurisdiction. *See generally Emery Worldwide Airlines, Inc. v. United States*, 49 Fed. Cl. 211, 220 (noting that the Postal Service is an "agency" under 28 U.S.C. § 451 (2006) and is therefore subject to this court's jurisdiction under the Tucker Act), *aff'd*, 264 F.3d 1071, 1080 (Fed. Cir. 2001). The County is incorrect, however, in its assertion that the Postal Service may be named as a separate defendant in this case, distinct from the United States. Under the Tucker Act, the United States is the only defendant over which this court may properly exercise subject matter jurisdiction. 28 U.S.C. § 1491(a)(1); *see also* RCFC 10(a) (noting that the United States must be designated as the defendant in this court).

19

*United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (*en banc* in relevant part). However, the statute "does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages." *Id.*

The substantive source of law upon which the County relies to establish this court's subject matter jurisdiction under the Tucker Act is section 1323(a), which states that

> [e]ach department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants, and each officer, agent, or employee thereof in the performance of his official duties, *shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity including the payment of reasonable service charges*.

33 U.S.C. § 1323(a) (emphasis added).

Importantly, section 1323(a) states that the government "shall" be subject to federal, state, and local water pollution requirements "including the payment of reasonable services charges." In general, the Federal Circuit has held that when Congress uses the mandatory term "shall" in a statute to describe the government's obligation to make a payment to a party or group, the statute is money mandating. *See Greenlee Cnty., Ariz. v. United States*, 487 F.3d 871, 877 (Fed. Cir. 2007) (noting that "use of the word 'shall' generally makes a statute money-mandating"); *Agwiak v. United States*, 347 F.3d 1375, 1380 (Fed. Cir. 2003) ("We have repeatedly recognized that the use of the word 'shall' generally makes a statute money-mandating."). Defendant does not contend that the government has any discretion to choose whether to comply with the requirements of section 1323; rather, the dispute between the parties is over the precise scope of that provision –

20

*i.e.*, whether the term "reasonable service charges" includes the type of charges at issue in this case.

In order to waive the government's sovereign immunity, Congress must use language that is unequivocal and unambiguous. *See United States v. Mitchell*, 445 U.S. 535, 538 (1980) (noting that a waiver of sovereign immunity must be "unequivocally expressed"). In contrast, the

> "fair interpretation" rule demands a showing demonstrably lower than the standard for the initial waiver of sovereign immunity. "Because the Tucker Act supplies a waiver of immunity for claims of this nature, the separate statutes and regulations need not provide a second waiver of sovereign immunity, nor need they be construed in the manner appropriate to waivers of sovereign immunity." It is enough, then, that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages. While the premise to a Tucker Act claim will not be "lightly inferred," a fair inference will do.

*White Mountain Apache*, 537 U.S. at 472-73 (citations omitted).

As the court will discuss below, Congress did not waive the government's immunity from the type of charges at issue in this case until January 4, 2011.[12] However, that conclusion – that the County's stormwater management charges are not covered by the pre-2011 version of section 1323 – does not require the court to dismiss the County's claims under RCFC 12(b)(1). Rather, as the Federal Circuit has explained,

> [a]ssuming that the Court of Federal Claims has taken jurisdiction over the cause as a result of the initial determination that plaintiff's cause rests on a money-

---

[12]/ There are two types of sovereign immunity implicated in this case. First, there is the government's immunity from suit, which was waived by the Tucker Act. In addition, there is the government's immunity from state and local taxation to fund stormwater management systems, which, as discussed in detail below, was not waived until January 4, 2011.

21

mandating source, the consequence of a ruling by the court on the merits, that plaintiff's case does not fit within the scope of the source, is simply this: plaintiff loses on the merits for failing to state a claim on which relief can be granted.

*Fisher*, 402 F.3d at 1175-76. The same is true here. The court may exercise jurisdiction over the County's claims in this case, at least those that are timely, because section 1323 may fairly be interpreted to mandate the payment of money by the government. Notwithstanding that jurisdictional basis, the County has failed to state a claim upon which relief can be granted because it has failed to demonstrate that its stormwater management charges fall within the scope of section 1323.

### B. Motion to Dismiss for Failure to State a Claim

In its motion to dismiss under RCFC 12(b)(6), defendant argues that the charges the County seeks to recover in this case are taxes that may not be imposed on federal properties or facilities without the prior consent of the United States. Defendant concedes that Congress waived the government's immunity from such taxes when it amended section 1323 on January 4, 2011, but argues that the waiver contained in the 2011 amendment cannot be applied retroactively, nor may it be viewed as an attempt by Congress to clarify an earlier waiver of immunity. In order to resolve the government's motion, the court must address three separate questions.

First, are the stormwater management charges at issue in this case properly viewed as taxes or fees? Second, if the charges are taxes rather than fees, did the government unequivocally and unambiguously waive its immunity from such taxes in the 1977 amendments to the Clean Water Act? Finally, if the government did not clearly waive its sovereign immunity in 1977, may the 2011 amendment be given retroactive effect as a mere clarification of the 1977 waiver, rather than as a new and separate waiver of sovereign immunity?

The court concludes that the County's stormwater management charge is a tax that cannot be imposed upon federal properties without the consent of the United States. The court further holds that Congress did not unequivocally waive the federal government's sovereign immunity from state taxation in 1977, and that

22

the 2011 amendment cannot be applied retroactively as a clarification of the initial waiver of sovereign immunity. For those reasons, the court must grant defendant's motion to dismiss under RCFC 12(b)(6).

### 1. DeKalb County's Stormwater Utility Charge Is a Tax

It is a fundamental principle of constitutional law that the United States is immune from direct taxation by state and local governments, including counties. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819); *see also Lee v. Osceola & Little River Rd. Improvement Dist. No. 1 of Mississippi Cnty., Mo.*, 268 U.S. 643, 620 (1925) ("It was settled many years ago that the property of the United States is exempt by the Constitution from taxation under the authority of a State as long as title remains in the United States.").

The federal government's immunity from state and local taxation is based upon the Supremacy Clause, U.S. Const. Art. VI, cl. 2, and is therefore absolute. *See United States v. Delaware*, 958 F.2d 555, 558 (3d Cir. 1992) (noting that the Supreme Court has adopted a broad reading of "the Supremacy Clause, viewing all state taxes on federal entities as insults to national sovereignty and impermissible burdens on federal operations"); *see also United States v. New Mexico*, 455 U.S. 720, 733 (1982) (noting that "the Court has never questioned the propriety of absolute federal immunity from state taxation"); *United States v. City of Columbia*, 914 F.2d 151, 153 (8th Cir. 1990) ("Unlike the states' immunity from federal taxation, which is somewhat limited, the United States' immunity from state taxation is a 'blanket immunity.'") (citation omitted).

Notwithstanding the absolute prohibition on state taxation, the government may be charged for services rendered or for its use of state or local property. *See, e.g.*, *Packet Co. v. Keokuk*, 95 U.S. 80, 85-86 (1877) (holding that a charge for the use of a public wharf was a user fee rather than a tax for constitutional purposes); *Cincinnati v. United States*, 153 F.3d 1375, 1376 (Fed. Cir. 1998) ("One issue courts have had to decide is whether the assessment in question should be characterized as a tax, and thus impermissible when imposed on a federal entity, or whether the assessment should be considered a fee for services provided to the federal entity, and therefore permissible.").

In short, there is no question that states cannot tax the federal government without its consent, but it is also clear that state governments may charge the

23

federal government a reasonable and nondiscriminatory fee for services rendered. Here, the court must determine whether the charges at issue in this case are most appropriately characterized as taxes or fees. The parties disagree on the answer to that question, and they cite different legal standards in reaching their divergent conclusions.

Before addressing the standards proposed by the parties, the court notes that it matters little that the Georgia Supreme Court has determined that the type of stormwater utility assessments at issue in this case are fees rather than taxes. *See McLeod v. Columbia Cnty.*, 599 S.E.2d 152, 154-55 (Ga. 2004). That decision does not affect the outcome here: "Where a federal right is concerned we are not bound by the characterization given to a state tax by state courts or Legislatures, or relieved by it from the duty of considering the real nature of the tax and its effect upon the federal right asserted." *Carpenter v. Shaw*, 280 U.S. 363, 367-68 (1930). Indeed, the state court addressed the issue only because a federal district court had remanded the case after determining that the charges were taxes under federal law. *See McLeod v. Columbia Cnty.*, 254 F. Supp. 2d 1340, 1344-49 (S.D. Ga. 2003) (holding that a county's stormwater management charges were taxes for purposes of the Tax Injunction Act, 28 U.S.C. § 1341 (2006)).

For the same reason, the court is not bound by the County's characterization of its charges as "stormwater service fees" in the stormwater ordinance. *See Collins Holding Corp. v. Jasper Cnty., S.C.*, 123 F.3d 797, 800 n.3 (4th Cir. 1997) ("Whether the body imposing the assessment labels it as a tax or a fee is not dispositive because the label is not always consistent with the true character of the assessment.") (citation omitted). Instead, in seeking to draw a line between an impermissible tax and a permissible fee, the court must "consider all the facts and circumstances of record in the case and assess them on the basis of the economic realities to determine the essential nature of the [charge]." *City of Columbia*, 914 F.2d at 154 (citation omitted).

### a. The *Massachusetts* Test

The County argues that the test set forth in *Massachusetts v. United States*, 435 U.S. 444 (1978), presents the most appropriate means of determining whether the stormwater charges in this case are permissible fees or impermissible taxes. While the decisions of the Supreme Court are, of course, binding on this court, the issues addressed in that case are not the issues now before this court, and the

holding in that case does not apply here. First, the issue before the court in this case is whether the County's stormwater management charges are fees or taxes, while the issue before the Supreme Court in *Massachusetts* was whether a federal tax imposed upon state property was reasonable. Further, this case requires the court to determine whether the County's stormwater charges are barred under the Supremacy Clause, while the Supreme Court's decision in *Massachusetts* was based not on that clause, but on the states' implied immunity from federal taxes.

i.     *Massachusetts* **Did Not Draw a Line between Permissible Fees and Impermissible Taxes**

In *Massachusetts*, the state argued that its implied immunity from federal taxation prohibited the assessment of an annual registration tax on a state-owned helicopter that was used exclusively for essential police functions. In reviewing the constitutional validity of that tax, the Supreme Court created a three-part test, which provides that federal taxes imposed on a state or its property do not violate that state's implied immunity from federal taxation when: (1) the tax is imposed in a nondiscriminatory manner; (2) the tax is a fair approximation of the benefits received by the taxed entity; and (3) the tax does not produce revenues that exceed the cost of the benefits provided. *Massachusetts*, 435 U.S. at 467. While the tax at issue in *Massachusetts* was designed to resemble a user fee in some respects, there was no dispute that the tax was in fact a tax.

Thus, the court is not faced with a choice between two competing tests for determining whether a particular charge is a fee or a tax. The *Massachusetts* test does not address that issue; instead, that test answers an entirely different question: when do federal taxes imposed on a state or its property unduly interfere with the traditional and essential functions of the state, thereby violating that state's implied immunity from federal taxation? In other words, the *Massachusetts* test does not attempt to draw a line between fees and taxes, but instead determines whether a tax is reasonable.

The *Massachusetts* test might be useful for evaluating whether the County's stormwater management charges are *reasonable*, but it cannot determine whether

they are fees.[13]  In fact, Congress adopted the basic framework of that test in the 2011 amendment to section 1323.  Because the waiver contained in section 1323 is limited to "reasonable service charges," the new language in the statute ensures that the government's liability under that section is in fact limited to charges that are reasonable.  In this case, however, the government does not contest or dispute the reasonableness of the County's stormwater charges.  *See* Tr. at 22-23.  Rather, the government argues only that the charges are taxes, and that Congress did not waive the government's immunity from such taxes until January 4, 2011.

### ii.     The Supreme Court's Holding in *Massachusetts* Was Not Based on the Supremacy Clause

The Supreme Court's analysis in *Massachusetts* is also inapposite because it was not based upon the Supremacy Clause.  In contrast to the federal government's immunity from state and local taxation, which is based on the Supremacy Clause, the states' immunity from federal taxation "was judicially implied from the States' role in the constitutional scheme." *Massachusetts*, 435 U.S. at 455.  For that reason, state immunity from federal taxation is not absolute, in sharp contrast to the federal government's categorical immunity from state taxation. *See City of Columbia*, 914 F.2d at 153 ("Generally, the states are immune from federal taxation that would unduly burden essential state functions.  Federal immunity from state taxation, however, is a blanket immunity and is not subject to the same limits.").

The Supremacy Clause categorically prohibits state and local taxation of federal property.  For that reason, the test described in *Massachusetts* – which is used to determine whether federal taxes on state-owned property violate that state's implied immunity from federal taxation – cannot be applied in this case. *See, e.g.*, *Oneida Tribe of Indians of Wisconsin v. Village of Hobart*, No. 10-C-137, 2012

---

[13]/  Indeed, in the case of *United States v. Renton*, No. C11-1156, 2012 WL 1903429 (W.D. Wash. May 25, 2012), upon which the County and amici rely in this case, the court there noted that the *Massachusetts* test is used to evaluate the reasonableness of a particular charge, not to determine whether that charge is a tax or a fee. *See id.* at \*7 ("[T]he factors in the *Massachusetts* test have been recognized as a test of the reasonableness of regulatory charges."), n.5 ("The issue here . . . is not whether reasonable service charges for stormwater programs are taxes, but the use of the *Massachusetts* factors in determining the reasonableness of regulatory charges.").

WL 3839570, at *6 n.5 (E.D. Wis. Sept. 5, 2012) ("Federal immunity from state taxation is predicated on the Supremacy Clause whereas state immunity from Federal taxation is implied from the states' relationship to the national government within the constitutional scheme. The difference is significant and makes the two analytically distinct. *Massachusetts* is accordingly inapplicable here.") (emphasis and citation omitted). In sum, the *Massachusetts* test does not apply here because it addresses a different question than the one now before this court, and it is based upon a different constitutional provision than the one this court must now apply.[14]

### b. The *San Juan Cellular* Test

Defendant urges this court to adopt the legal framework first established in *San Juan Cellular Telephone Co. v. Public Service Commission*, 967 F.2d 683 (1st Cir. 1992). There, the United States Court of Appeals for the First Circuit explained that a number of courts have been required to draw a line between permissible fees and impermissible taxes, and noted that those courts

> have sketched a spectrum with a paradigmatic tax at one end and a paradigmatic fee at the other. The classic "tax" is imposed by a legislature upon many, or all citizens. It raises money, contributed to a general fund, and spent for the benefit of the entire community. The classic "regulatory fee" is imposed by an agency upon those

[14] The County and amici note that the United States Court of Appeals for the First Circuit used the three-part *Massachusetts* test to evaluate the validity of a state charge imposed on the federal government in *Maine v. Department of Navy*, 973 F.2d 1007 (1st Cir. 1992), and thus argue that the application of the test is not limited to those situations in which the federal government has imposed a tax on a state government. In that case, however, the First Circuit did not apply the test set forth in *Massachusetts* to determine whether the charge at issue was a fee or a tax. Instead, the question before that court was whether the charges at issue – which the parties agreed were fees – were unreasonable. The First Circuit noted that the government had waived its immunity only with respect to *reasonable* service charges, and then applied the *Massachusetts* test for the purpose of evaluating the government's contention that the licensing fees imposed by the state were unreasonably high. The statute at issue in *Maine* was the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901-6992k (2006), which contains a provision that is substantially similar to the Federal Facilities Section of the Clean Water Act.

> subject to its regulation. It may serve regulatory
> purposes directly by, for example, deliberately
> discouraging particular conduct by making it more
> expensive. Or, it may serve such purposes indirectly by,
> for example, raising money placed in a special fund to
> help defray the agency's regulation-related expenses.

*Id.* at 685 (citations omitted).

Many courts have borrowed the analysis in *San Juan Cellular* to distinguish permissible fees from impermissible taxes. *See, e.g.*, *Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134-36 (4th Cir. 2000); *Collins Holding*, 123 F.3d at 800-01; *McLeod*, 254 F. Supp. 2d at 1345-48; *Oneida Tribe*, 2012 WL 3839570, at *6-*8. Those courts have applied that analysis as a three-part inquiry that asks the following questions. First, which governmental entity imposed the charge? Next, which parties must pay the charge? And finally, for whose benefit are the revenues generated by the charge spent?

The County and amici argue that *San Juan Cellular*, and many of the other cases that applied its analysis, are simply inapplicable here because the question in those cases was whether the charge at issue was a fee or a tax for purposes of the Tax Injunction Act (TIA), 28 U.S.C. § 1341, and not whether a state charge could be assessed against federal property without violating the Supremacy Clause.[15] While that observation is correct, the court does not find it to be particularly relevant. Unlike the test in *Massachusetts*, which the County and amici contend is applicable here, the analysis in *San Juan Cellular* actually addresses the issue that is now before the court. The court finds the analysis in *San Juan Cellular* to be persuasive and holds that the use of a three-part test based on that analysis represents an appropriate approach to drawing the line between fees and taxes. Finally, as discussed in more detail below, the third – and most important – factor of the *San Juan Cellular* inquiry is fully consistent with the Supreme Court's observation that a government agency that provides a service "may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other

---

[15]/ In *San Juan Cellular*, the First Circuit determined whether a regulatory charge was a fee or a tax under the Butler Act, 48 U.S.C. § 872 (2006), a statute designed to minimize the interference of federal courts with the collection of taxes imposed under the laws of Puerto Rico, in the same way that the TIA minimizes such interference with respect to state and local taxes.

members of society." *Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336, 340-41 (1974). The court notes the legal context in which the *San Juan Cellular* analysis was first developed, but nonetheless holds that it is the more appropriate analytical framework for the question now before the court.

### i.      Which Entity Imposed the Charge?

First, the court must examine which governmental entity imposed the charge in this case. When an assessment is imposed by a legislative body, rather than an administrative agency, it is more likely to be viewed as a tax than as a fee. *See San Juan Cellular*, 967 F.2d at 686. Here, the stormwater charges were adopted, and their precise amounts were set, by the County's board of commissioners. The stormwater utility does not have the authority to revise the rates set forth in the ordinance; instead, the specified rates may be amended only by action of the "governing authority" – *i.e.*, the County's board of commissioners and chief executive. *See* County Code § 25-365(b) ("The stormwater service charge per equivalent residential unit shall be four dollars ($4.00) per month *or as amended by official action of the governing authority*.") (emphasis added).

Some courts have noted that "[i]f the responsibility for administering and collecting the assessment lies with the general tax assessor, it is more likely to be a tax; if this responsibility lies with a regulatory agency, it is more likely to be a fee." *Collins Holding*, 123 F.3d at 800. Here, the County's stormwater charges are billed to the government on an invoice from the County's tax commissioner. *See* Booth Aff. Ex. 1. The County's deputy tax commissioner, who is also its director for delinquent collections, "oversee[s] collection of delinquent stormwater utility fees on behalf of DeKalb County, Georgia." *Id.* ¶ 3. The stormwater utility does not collect the assessments that are ultimately deposited into the enterprise fund. The stormwater charges in this case were adopted and set by the County's legislative body, and they are collected by the County's tax collector. Those facts, under the first prong of the *San Juan Cellular* test, suggest that the stormwater assessments in this case are taxes rather than fees.

### ii.      Which Parties Must Pay the Charge?

Next, the court must examine which parties are subject to the assessments. If the charge is imposed upon all citizens, or a broad class of them, then the charge is more likely to be a tax; if the charge is imposed only upon a narrow group, then

the charge is more likely to be a fee. *San Juan Cellular*, 967 F.2d 685. Here, the County's stormwater management charge is not assessed against a narrow group of residents or businesses; instead, the assessment is levied against every single owner of developed property in the unincorporated portions of the county.[16]

The stormwater charge is assessed against every dwelling in the county, as well as "commercial and office buildings, industrial and manufacturing buildings, storage buildings and storage areas covered with impervious surfaces, parking lots, parks, recreation properties, public and private schools and universities, research stations, hospitals and convalescent centers, airports, and agricultural uses covered by impervious surfaces." County Code § 25-361 (providing definitions of "single dwelling lot," "multiple dwelling lot," and "other developed land"); *id.* § 25-365 (setting the charges applicable to single dwelling lots, multiple dwelling lots, and other developed land). The ordinance further notes that the majority of the land within the unincorporated portion of the county is in fact developed. *Id.* § 25-360(d).

In sum, the stormwater charges that the County seeks to recover in this case are imposed upon every homeowner who lives in the unincorporated portion of the county and every business that is located there, as well as every other lot that is covered with any impervious surface, ranging from the smallest doghouse to the largest church, airport, or sports stadium. Because the County's stormwater charge is not assessed against a narrow group, but is instead imposed on the majority of property in the unincorporated portions of the county, *see id.* § 25-360(d), the second factor of the *San Juan Cellular* inquiry also suggests that the charge is a tax.

---

[16]/ The term "developed land" is defined as all property that is not "undeveloped land," which is in turn defined as "a lot in its unaltered natural state and which has no pavement, asphalt, or compacted gravel surfaces or structures which create an impervious surface that would prevent infiltration of stormwater or cause stormwater to collect, concentrate, or flow in a manner materially different than that which would occur if the land was in an unaltered natural state." County Code § 25-361. In other words, with the exception of rights of way – both public and railroad – developed land includes any property covered with any amount of impervious surface.

### iii. For Whose Benefit Are the Revenues Spent?

Finally, the court must examine for whose benefit the revenues generated by the charge are spent. If the County spends the revenue to provide a benefit for the general public, then the charge is more likely to be a tax, but if the revenue is spent to provide a particularized benefit for a narrow group, or to offset the cost of regulating a narrow group, then the charge is more likely to be a fee. Here, the court concludes that the stormwater management charges are used to finance benefits that inure primarily to the benefit of the general public.

The First Circuit has explained that the third part of the *San Juan Cellular* inquiry is often the most important: "[c]ourts facing cases that lie near the middle of this spectrum have tended . . . to emphasize the revenue's ultimate use, asking whether it provides a general benefit to the public, of a sort often financed by a general tax, or whether it provides more narrow benefits to regulated companies or defrays the agency's costs of regulation." *San Juan Cellular*, 967 F.2d at 685.

The stormwater ordinance describes the purpose of the utility, noting that the "provision of stormwater management services and facilities in DeKalb County promotes an essential regulatory purpose by controlling where stormwater runoff flows and how it is disposed, and thereby reducing flooding, erosion and water pollution caused by stormwater runoff." County Code § 25-360(e). Further, the ordinance explains that

> [t]he board of commissioners is responsible for the protection and preservation of the public health, safety, and welfare of the community, and finds that it is in the best interest of the health, safety, and welfare of the citizens of the county and the community at large to proceed with the development, implementation, and operation of a utility for stormwater management accounted for in the county budget as a separate enterprise fund dedicated solely to stormwater management and to institute funding methods associated therewith.

*Id.* § 360(g); *see also* Tr. at 36 (noting that revenue deposited in the enterprise fund is spent to further the purposes of drainage control and flood control), 38

31

(explaining that the stormwater utility promotes the essential regulatory purposes of preventing floods, erosion, and water pollution).

The purposes of the stormwater ordinance, and of the stormwater system – *i.e.*, flood prevention and the abatement of water pollution – are benefits that are enjoyed by the general public. For that reason, the charge is more properly viewed as a tax than as a fee. *See San Juan Cellular*, 967 F.2d at 685 (noting that the revenue from a tax "is spent for the benefit of the entire community"). Those benefits are public; they are not individualized services provided to particular customers.

The presence of a stormwater management system, and the imposition of charges to fund that system, create reciprocal benefits and burdens for nearly all owners of developed property within the unincorporated areas of DeKalb County. While each property owner is burdened by payment of the charge, and enjoys no special benefit by virtue of the connection of its own property to that system, the property owner does derive a benefit from the fact that stormwater runoff from other properties is collected and diverted by the system. That benefit, however, is one that is shared with nearly every other member of the community. In short, flood control is a public benefit, and charges to pay for that benefit are typically viewed as taxes. *See, e.g.*, *United States v. City of Huntington, W.V.*, 999 F.2d 71, 73 (4th Cir. 1993) (explaining that because flood control and fire prevention are both "core government services," assessments to pay for those services are taxes).

The abatement of water pollution is also an important benefit of the system, and it is likewise a public benefit that is shared with the rest of the community. The owners of developed property, who pay the stormwater management charges, receive no special benefit from clean rivers, streams, and lakes that is not also enjoyed by the general public. *Cf. Mildenberger v. United States*, 91 Fed. Cl. 217, 245-47 (2010) (noting that water pollution is a harm that is experienced not only by riparian landowners, but by the public as a whole), *aff'd*, 643 F.3d 938 (Fed. Cir. 2011).

The stormwater system is a local infrastructure improvement that provides benefits – *i.e.*, drainage, flood protection, and water pollution abatement – not only to the owners of developed property who pay stormwater utility charges, but also to the owners of undeveloped property, who do not pay the charge, and to other members of the general public who may not own any property in the county at all.

The Supreme Court has noted that "[a]ssessments upon property for local improvements are involuntary exactions, and in that respect stand on the same footing with ordinary taxes." *Hagar v. Reclamation Dist. No. 108*, 111 U.S. 701, 707 (1884).

In addition to listing the generalized public benefits discussed above, the ordinance also states that the stormwater management system provides

> a specific service to property owners by assisting in the property owner's legal obligation to control stormwater runoff from their property and ensure that runoff does not flow upon their neighbors in greater quantities than it would if the property were in an undeveloped state. By mitigating the impact of stormwater runoff from developed property, the stormwater management system helps prevent damage that would subject a property owner to civil liability.

County Code § 25-360(f). The County argues that it is this service – the reduction in the risk of legal liability due to damage from stormwater runoff – that transforms the assessment here into a fee rather than a tax.

The court first notes that it is not clear whether defendant would in fact be subject to any liability for damage to neighboring properties due to stormwater runoff from federal facilities. During oral argument, counsel for amici suggested that the government might be subject to an action under the citizen-suit provision of the CWA, 33 U.S.C. § 1365 (2006), but both he and counsel for the County were uncertain as to whether the government might be subject to liability for either trespass or nuisance under the common law of Georgia.[17] However, the court need not determine the extent of the government's liability for such damage because the so-called "benefit" cited by the County is problematic in a number of respects.

---

[17]/ The court notes that the government might be subject to suit in certain circumstances under the Takings Clause of the Fifth Amendment. *See, e.g.*, *Ridge Line, Inc. v. United States*, 346 F.3d 1346 (Fed. Cir. 2003) (evaluating whether the construction of a Postal Service facility, which dramatically increased the flow of stormwater onto a downhill property, could effect a taking of a flowage easement requiring the payment of just compensation to the owner of the affected property).

First, the stormwater ordinance expressly provides that every property owner is responsible for managing the flow of stormwater runoff on its own property, regardless of whether those owners have remitted the stormwater charges imposed by the County:

> [e]very owner of real property located in the unincorporated area of the county, and every person who serves as a contractor or developer for the purpose of developing real property located in the unincorporated area of DeKalb County shall provide, manage, maintain, and operate on-site stormwater management systems and facilities sufficient to collect, convey, detain, control and discharge stormwater in a safe manner consistent with all DeKalb County ordinances and development regulations, and the laws of the State of Georgia and the United States of America.

County Code § 25-372. The ordinance further states that "[a]ny failure to meet this obligation shall constitute a nuisance and be subject to an abatement action filed by any damaged party or DeKalb County in any court of competent jurisdiction." *Id.* In short, payment of the charge does not appear to relieve any property owner of its liability for damage to neighboring properties caused by stormwater runoff.

In addition, even if payment of the stormwater charges effectively protected property owners from such liability, there is no apparent relationship between the value of the benefit and the amount of the charge. The stormwater assessment is generally based on the amount of impervious surface on the charged property. While that measurement may provide a rough approximation of the quantity of stormwater runoff generated by that property, it does not have any clear connection to the amount of damage such runoff might cause to neighboring properties and, consequently, the property owner's potential liability for such damage. Instead, the damage due to stormwater runoff from a particular property will depend upon a number of other factors, such as topography, whether the surrounding properties are developed, and the types of improvements located on those properties.[18]

---

[18]/ This absence of proportionality might be more relevant to the reasonableness of the charge, rather than whether the charge is a fee or a tax, but the court believes that the apparent lack of proportionality also undermines the County's argument that "liability protection" is an

34

While user fees are generally based on the quantum of services that are provided, the assessments in this case are not necessarily based on the benefits provided to each owner of developed property. First, the stormwater charges in this case are based not on the *benefits* derived by the payor, but by the anticipated *burden* that its property imposes on the stormwater system. However, the burden imposed on the system by the runoff from the property, and the benefits conferred upon that property by the system are not the same thing. There may be properties, for example, that impose significant burdens on the stormwater system while deriving no substantial benefit from that system (*e.g.*, a property with extensive impervious coverage that is located on the top of a hill). Similarly, there may be properties that have little impact on the stormwater system that receive substantial benefits from that system (*e.g.*, a small home on a large, otherwise undeveloped lot that is located downhill from extensive development). Second, even if the benefits conferred on specific properties and the burdens those properties impose on the system were treated as if they were the same, the amount of the charge does not depend upon the burden actually imposed on the system by a particular property. Regardless of how much rain falls on a property, and how much of that rain actually leaves the property and flows into the system, the charge remains the same. *See Cincinnati v. United States*, 39 Fed. Cl. 271, 276 (1997) ("Under the system enacted by the City of Cincinnati, during a month of drought or a month of flooding, the federal government would be assessed the same amount of storm drainage charges.").

In further support of its position, the County argues that its charges should be viewed as fees because they are deposited into a separate enterprise fund that may be used only for costs related to the stormwater management system, rather than being directed into the County's general revenue account. *See* Pl.'s Resp. at 18. The fact that the revenue generated by the stormwater management charge is segregated from other revenue, and is ultimately deposited into a separate enterprise fund, is not a sufficient basis for determining that the charge is a fee. *See Valero*, 205 F.3d at 135 (explaining that "[i]f the revenue of the special fund is used to benefit the population at large then the segregation of the revenue to a special fund is immaterial") (citation omitted). Here, the revenue from the charge is used to fund a stormwater management system that benefits the public at large, so the fact that the revenue is segregated into a separate account is not especially

individualized service provided to property owners in exchange for payment of the charge.

35

relevant.[19]

The court does not doubt the precarious financial situation of the County and other similarly situated counties and municipalities all over the country. The cost of operating stormwater management facilities has increased dramatically in recent years, and much of that increase is attributable to new requirements imposed by the federal government. Further, the tax-exempt status of federal facilities and other properties that impose significant burdens on the stormwater management system has severely limited the ability of local governments to fully recoup those costs. In light of the difficulties – both legal and political – of raising taxes, many counties and municipalities have attempted to structure their taxes as user fees to avoid the legal restrictions that apply to the former but not to the latter.

Unfortunately, the nature of a stormwater management system, which benefits the public without providing any individualized, measurable benefit to individual property owners, does not lend itself to a system of funding based on user fees. The United States Court of Appeals for the Ninth Circuit has noted that "[w]hen a fee is imposed on the United States for the purpose of extracting by fee that which cannot be extracted by taxation, the imposition of that fee may violate the Supremacy Clause." *Novato Fire Prot. Dist. v. United States*, 181 F.3d 1135, 1139 (9th Cir. 1999) (citations omitted). The stormwater management charges at issue are a mechanism designed to raise revenue from the federal government and, of course, other property owners to cover the rapidly increasing costs of a local improvement that benefits the public as a whole. *See* Amicus Br. at 8-9 (explaining that "municipalities began to enact and enforce stormwater ordinances starting in the 1990s, such as [impervious area charges] to cover the increasingly stringent costs of stormwater controls").

---

[19]/ In *San Juan Cellular*, the First Circuit also noted that a particular charge may be an impermissible tax if it is used to pay for a public benefit that is often financed with taxes. 967 F.2d at 685. In holding that the stormwater charges assessed by another Georgia county were taxes rather than fees, the United States District Court for the Northern District of Georgia noted that "[s]torm water management was and is the type of service that is often funded through general tax revenue." *McLeod*, 254 F. Supp. 2d at 1348; *see also Financing Stormwater Facilities: a Utility Approach* (1991), at 1 ("Stormwater management historically has been financed with general revenues from property taxes."), *available at* http://stormwaterfinance.urbancenter.iupui.edu/PDFs/APWAmanual.pdf.

In summary, the court concludes that under the *San Juan Cellular* test, the stormwater management charges assessed by the County are impermissible taxes that may not be imposed on federal properties without the government's consent. The charges are set by the County's legislative body, they are imposed on every owner of developed property in the unincorporated portion of the county, and they are used to provide benefits that are enjoyed by the public as a whole.

### c. The Involuntary Nature of the Charge

The government argues that the charges in this case should be viewed as taxes because they are involuntary, while the County asserts that its assessments are a fee for services rather than "an inescapable charge based solely upon the mere fact of property ownership." Pl.'s Resp. at 17 n.10. In addition to finding that the County's stormwater charges are taxes under the *San Juan Cellular* test, the court further concludes that the charges more closely resemble taxes due to their involuntary nature.

In *National Cable*, 415 U.S. at 340, the Supreme Court explained that "[a] fee is incident to a voluntary act."[20] In a number of other cases, the Court has contrasted the voluntary nature of a fee with the mandatory nature of a tax. *See, e.g.*, *United States v. LaFranca*, 282 U.S. 568, 572 (1931) (explaining that taxes are "enforced contribution[s] to provide for the support of government"); *Hagar*, 111 U.S. at 707 (explaining that "[a]ssessments upon property for local

_____

[20]/ The County argues that the standard set forth in *National Cable* should not be applied here because that standard was based on the specific statute at issue in that case. There, the petitioner had challenged licensing charges imposed upon cable television companies by the Federal Communications Commission (FCC) pursuant to the Independent Offices Appropriation Act of 1952, 31 U.S.C. § 9701 (2006), which authorized certain agencies to impose service charges based on, *inter alia*, the value of the services provided to the recipient. The Court held that Congress had not delegated the power of taxation to the FCC, and that the power granted to the agency under the statute must therefore be limited to the authority to impose fees rather than taxes. The Supreme Court reversed the lower appellate court with instructions to remand the case to the FCC so the agency could determine whether its proposed service charges were proportionate to the cost of the services that were actually provided to the regulated companies. The language from *National Cable* upon which the court now relies, however, is contained within a general discussion of the essential differences between fees and taxes, and its applicability is not limited to the facts of that case. In any event, *National Cable* is not the only case in which the Supreme Court has described fees as voluntary and taxes as compulsory.

improvements are involuntary exactions, and in that respect stand on the same footing with ordinary taxes").

Fees generally fall into two broad categories:  user fees, which a government may charge in exchange for services or the use of government-owned property, and regulatory fees, which are charges that are imposed by a regulatory agency to recoup its costs of regulation.  In both cases, the payment of the fee is voluntary.  With a user fee, one can avoid the charge by not accepting the government's services or by not using the government's property.  With a regulatory fee, one can avoid the charge by not engaging in the regulated activity.  *See City of Columbia*, 914 F.2d at 156 ("When the United States purchases water, electricity, and related services, and then pays the utility bill, it does so as a vendee pursuant to its voluntary, contractual relationship with the City.  The City imposes the charge not in its capacity as a sovereign, but as a vendor of goods and services.").

Here, those subject to the stormwater utility charge have no choice but to pay that charge.  The government never requested stormwater management services from the County, and it cannot simply decline to use those services.  Instead, the government's liability arises solely from its status as the owner of developed property located within the unincorporated part of the county.  *See id.* at 155 (noting that "[t]he United States' obligation to pay [a user fee] arises only from its consensual purchase of the City's property; it does not arise automatically, as does tax liability, from the United States' status as a property owner").  The Federal Circuit has held that a stormwater management charge that is based solely on the mere ownership of property is involuntary.  *See Cincinnati*, 153 F.3d at 1377-78.  There, the court explained that a charge applicable to all owners of developed property and based on the amount of runoff the property was expected to generate was not a voluntary purchase of services:

> The storm drainage service charge was not imposed as a result of a consensual arrangement between the city and the United States, as would be true in the case of a voluntary purchase of utilities or other services.  Instead, the stormwater drainage service charge was an assessment imposed on the United States involuntarily, by virtue of its status as a property owner.  While the United States may be said to be a beneficiary of the storm drainage services provided by the city, it was not offered

38

the opportunity to choose whether to accept those benefits, and it cannot be said to have taken any action (other than not moving out of Cincinnati when the charges were assessed) to indicate its willingness to pay the charges.

*Id.* The Federal Circuit concluded that the involuntary nature of the stormwater charge defeated the city's assertion of an implied-in-fact contract for services.[21]

In addition, the County cannot realistically terminate service to any property due to the nonpayment of stormwater charges. During oral argument, when the court asked counsel for the County whether it was physically possible to deny any particular property owner the benefits of the stormwater management system, he responded that the County could "plug up the drainage system with concrete."[22] Tr. at 94. However, the County has a legal obligation to operate its stormwater management system in accordance with the requirements set forth in its NPDES permit, and disabling portions of that system would be an abdication of its legal

---

[21]/ The Federal Circuit expressly declined to address whether the stormwater charge in that case was a fee or a tax, *Cincinnati*, 153 F.3d at 1378, and noted that the involuntary nature of a charge, without more, is not necessarily sufficient to transform the charge into a tax:

> The involuntary nature of the charge, however, is not dispositive. There may be some instances in which a municipal assessment is involuntarily imposed but would nonetheless be considered a permissible fee for services rather than an impermissible tax.

*Id.* Here, the court's determination that the County's stormwater management charges are taxes is not based solely on the involuntary nature of those charges. Rather, the compulsory nature of the charge is just one consideration in addition to the court's determination that the assessment is a tax under the *San Juan Cellular* test.

[22]/ The court did not understand counsel's response to be a serious answer to the court's question. If the County were to physically obstruct the storm drains closest to the government's facilities, runoff from those facilities would almost certainly find its way into the stormwater management system somewhere else, while possibly causing damage to other nearby properties. With the exception of some fanciful approaches, such as acquiring land around the perimeter of the federal properties to construct levies that completely prevent stormwater runoff from leaving those properties, there does not appear to be any physical means of denying any particular property owner the benefits of the stormwater management system.

responsibility to manage the stormwater within its service area, including runoff that originates on federal properties.

If it were possible to deny any particular property owner the benefits of the stormwater management system, one would expect the ordinance to provide for the termination of services due to nonpayment.  Instead, the ordinance provides that "[u]npaid stormwater service fees shall be collected by filing suit to collect on an unpaid account and by using all methods allowed by Georgia law to collect on any judgment obtained thereby."  County Code § 25-371(a).  Because the default method of addressing nonpayment is litigation, rather than termination of service, the stormwater management charges at issue in this case yet again appear to be taxes rather than fees.  *See City of Columbia*, 914 F.2d at 155 (noting that "while failure to pay a tax results in civil and sometimes criminal penalties, the failure to pay a portion of a utility rate results in termination of services").

Finally, the County argues that its stormwater management charges are voluntary because property owners may receive credits against the charges for adopting specified stormwater management systems on their own property, and may even receive a complete exemption from the charges if they manage 100 percent of the rainfall on their property on their own land.  The court does not believe that the availability of such credits and exemptions alters the nature of the charge – it is still a tax, regardless of whether some of those subject to the tax may receive a partial or even total exemption by constructing and operating costly stormwater management facilities on their own property.  In addition, the credits – in contrast to the full exemption – may amount to no more forty percent of the assessed charge, so that property owners who manage ninety-nine percent of their stormwater on-site will still be subject to sixty percent of the normal assessment.  *See* County Code § 25-369(a).  Finally, as the government has noted, the Internal Revenue Code, Title 26 of the United States Code (2006), provides a number of credits and exemptions from tax liability, but those credits and exemptions do not transform federal taxes into fees.

### 2. Section 1323(a), prior to the 2011 Amendment, Did Not Waive the Federal Government's Sovereign Immunity from State or Local Taxation

The County and amici argue that the language of section 1323 – even before it was amended in 2011 – represents an unequivocal waiver of the government's

40

immunity from the type of stormwater management charges at issue in this case. The government concedes that section 1323, as amended in 2011, subjects it to prospective liability for stormwater management charges, whether characterized as fees or taxes, but argues that the 1977 version of that section did not contain an unambiguous waiver of the government's sovereign immunity from state or local taxes. The court agrees with the government.

For the reasons discussed by the court above, "it is well settled that, absent express congressional authorization, a State cannot tax the United States directly." *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 175 (1989). To waive the government's sovereign immunity, Congress must express its intent to do so in terms that are unequivocal and unambiguous. *See F.A.A. v. Cooper*, 132 S. Ct. 1441, 1448 (2012) ("We have said on many occasions that a waiver of sovereign immunity must be 'unequivocally expressed' in statutory text.") (citation omitted). For that reason, "[a]ny ambiguities in the statutory language are to be construed in favor of immunity, so that the Government's consent to be sued is never enlarged beyond what a fair reading of the text requires." *Id.* (citations omitted).

In addition, "[a] statute's legislative history cannot supply a waiver that does not appear clearly in any statutory text." *Lane v. Pena*, 518 U.S. 187, 192 (1996); *see also Cooper*, 132 S. Ct. at 1448 ("Legislative history cannot supply a waiver that is not clearly evident from the language of the statute.") (citation omitted). The standards applicable to a waiver of sovereign immunity are not lowered simply because section 1323 purports to place the federal government on the same footing as private parties. Instead, "statutes placing the United States in the same position as a private party [must be] read narrowly to preserve certain immunities that the United States has enjoyed historically." *Library of Congress v. Shaw*, 478 U.S. 310, 320 (1986).

There is no question that section 1323(a) waives the federal government's immunity from "reasonable service charges," but the scope of that waiver is far from clear. First, the term is not defined in the statute, and dictionary definitions do not support the County's arguments here. *See* Black's Law Dictionary 1491 (9th ed. 2009) (defining a "service charge" as "[a] charge assessed for performing a service, such as the charge assessed by a bank against the expenses of maintaining or servicing a customer's checking account"). The definition of "service charge" more closely corresponds with the definition of a fee, *see id.* at 690 (a "charge for labor or services"), than with the definition of a tax, *see id.* at 1594 (a "charge, usu.

41

monetary, imposed by the government on persons, entities, transactions, or property to yield public revenue").

Second, the more circumscribed reading of the 1977 version of section 1323 – *i.e.*, that the term "reasonable service charges" includes fees but not taxes – is also supported by the term that Congress actually used:  reasonable *service* charges.  The Federal Facilities Section does not waive the government's immunity from all "reasonable charges," which might provide a somewhat more plausible basis for concluding that the term includes taxes in addition to fees.  Instead, the term is qualified, and suggests that Congress intended to limit its waiver to fees that were imposed in connection with the provision of a service.  *See id.* at 1491 (defining the term "service" as "[t]he act of doing something useful for a person or a company, *usu. for a fee*") (emphasis added).

The Supreme Court has explained that a statute purporting to waive the government's immunity is ambiguous "if there is a plausible interpretation of the statute that would not authorize money damages against the Government." *Cooper*, 132 S. Ct. at 1448.  Here, there is at least one plausible interpretation of section 1323 that would not authorize the damages the County seeks in this case: that section 1323 waives the government's immunity from fees but not from taxes. Section 1323, as it existed before January 2011, could be interpreted to waive the government's immunity from both regulatory fees, such as the fees charged to process a permit application, and user fees, such as fees charged for the provision of water or the disposal and treatment of sanitary sewage.  On the other hand, section 1323 need not be read to waive the government's sovereign immunity from state or local taxes, such as the stormwater management charges at issue in this case.  When faced with two plausible readings of a waiver of sovereign immunity, one broad in scope and one narrow, the court must interpret the statute narrowly. *Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1311 (Fed. Cir. 2011) (noting that any waiver of sovereign immunity must be "unequivocally expressed in statutory text and will be strictly construed, in terms of its scope, in favor of the sovereign") (citation and internal quotations omitted).

In sum, the version of section 1323 that existed prior to January 4, 2011 did not contain an unambiguous waiver of the government's sovereign immunity from state or local taxes.  In fact, amici appear to concede that the 1977 version of the statute is not amenable to a broader construction.  *See* Tr. at 65-66 ("I don't think you can read [the 1977 version of section 1323] to say that Congress waived

[sovereign immunity] for something that would meet the test of a tax."). In any case, the County and amici argue that Congress passed the 2011 amendment to clarify the intended meaning of section 1323. For that reason, the County and amici contend that section 1323 must be read as if it had always been so clarified.

### 3. Section 1323(c) Cannot Be Treated as a Clarification of an Earlier Waiver of the Government's Sovereign Immunity if Doing So Would Expand the Scope of the Original Waiver

In their brief to the court, amici assert that the 2011 amendment was nothing more than a clarification of an earlier waiver of sovereign immunity contained in the 1977 amendments to the Clean Water Act. In support of that argument, amici cite the decision of the United States Court of Appeals for the Eleventh Circuit in *Piamba Cortes v. American Airlines, Inc.*, 177 F.3d 1272 (11th Cir. 1999). There, the court held that an amendment will be viewed as a clarification of an earlier statute when: (1) the language of the earlier statute was ambiguous and in need of clarification; and (2) Congress has declared its intent to clarify the earlier statute. *Id.* at 1283-84. In their brief, amici also reference the Ninth Circuit's decision in *United States v. Sanders*, 67 F.3d 855, 856 (9th Cir. 1995), which explained that "when an amendment is a clarification, rather than an alteration, of existing law, then it should be used in interpreting the provision in question retroactively." In its reply in support of its motion for summary judgment, the County adopts the clarification argument advanced by amici. Unfortunately for the County, the standard set forth in *Piamba Cortes* is fundamentally inconsistent with the standards for a waiver of sovereign immunity.

In normal circumstances, when a waiver of sovereign immunity is not involved, a court can discern the meaning of ambiguous statutory language by reference to extrinsic evidence of congressional intent. However, such evidence is generally limited to legislative history that preceded the enactment of the statute. *See, e.g.*, *Ogilvie v. United States*, 519 U.S. 79, 90 (1996) (noting that "the view of a later Congress cannot control the interpretation of an earlier enacted statute"); *United States v. Prince*, 361 U.S. 304, 313 (1960) ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one."). *Piamba Cortes* provides an exception to that general rule of statutory construction, allowing a court to treat an amendment to an ambiguous statute as a "clarification" of that statute, and to interpret the statute as if it had always been so clarified – essentially giving the amendment retroactive effect.

43

While there is no requirement that statutes be applied only prospectively, there is a strong presumption against retroactive application: "The presumption against retroactive application is deeply rooted in our jurisprudence and embodies a legal doctrine centuries older than our Republic." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). When a statute effects a substantive change in the law, it cannot be applied retroactively unless Congress has expressly indicated its intent that the statute be given retroactive effect. *See Travenol Labs. v. United States*, 118 F.3d 749, 752 (Fed. Cir. 1997) (noting that "retroactivity in general is not favored in the law and, accordingly, legislation will be applied only prospectively unless Congress has clearly expressed a contrary intention"). In *Piamba Cortes*, however, the Eleventh Circuit explained that the usual concerns about retroactive application of a statutory amendment are not implicated when the amendment merely clarifies prior law rather than effecting a substantive change in the law. 177 F.3d at 1283. For that reason, an amendment that does nothing more than clarify existing law may be given retroactive effect even in the absence of a clear statement from Congress indicating that the amendment is to be applied retroactively.

In contrast to most statutes, however, a waiver of sovereign immunity must be expressed in clear and unambiguous terms, and any ambiguities contained in the statute must be resolved in favor of immunity. *See Cooper*, 132 S. Ct. at 1448. Further, a court may not examine legislative history or any other type of extrinsic evidence of congressional intent in interpreting the scope of the waiver. *See id.* Rather, any waiver of sovereign immunity must be "unequivocally expressed in statutory text and will be strictly construed, *in terms of its scope*, in favor of the sovereign." *Lumbermens*, 654 F.3d at 1311 (emphasis added). For that reason, it does not appear that Congress could ever clarify the scope of an earlier waiver of sovereign immunity under *Piamba Cortes* because a statute may be clarified only if it is *ambiguous*, while a statute can effect a waiver of sovereign immunity only if it is *unambiguous*. Here, the court has already determined that the 1977 version of section 1323 did not contain a clear, unambiguous waiver of the government's sovereign immunity from taxes. Because the earlier version of section 1323 was ambiguous with respect to whether it waived the government's immunity from taxes, there was no effective waiver from taxes in 1977 that could have been later

44

clarified in 2011.[23]

The court disagrees with the contrary conclusion of the United States District Court for the Western District of Washington in *United States v. Renton*, No. C11-1156, 2012 WL 1903429 (W.D. Wash. May 25, 2012). In that case, the district court concluded that the government was liable to two municipalities for stormwater charges assessed against federal property in years prior to the adoption of the 2011 amendment to section 1323. The district court first held that the 1977 version of that section contained an unambiguous waiver of the government's immunity from "reasonable service charges." Next, the court determined, based largely on legislative history, that the 2011 amendment was not a new waiver of sovereign immunity, but was instead a mere clarification of the earlier version of section 1323. Finally, because it held that the 2011 amendment clarified the earlier version of the statute, the court concluded that traditional canons of statutory construction required the amendment to be given retroactive effect. There are at least two problems with the district court's analysis.

First, while the district court properly held that the 1977 version of section 1323 contained an unambiguous waiver of the government's sovereign immunity from "reasonable service charges," it failed to appreciate that the scope of the disputed term was, in fact, ambiguous. As discussed above, there are at least two plausible interpretations of the term "reasonable service charges": first, that the term encompasses both fees and taxes, and, in the alternative, that the term is limited to fees alone. Because ambiguities must be resolved in favor of immunity, the district court should have concluded that the 1977 version of section 1323, prior to its amendment in 2011, did not waive the government's sovereign immunity from state and local taxation. Instead, the district court adopted the more expansive interpretation of section 1323 and, based on that faulty premise, held that the 2011 amendment was nothing more than a clarification of a pre-existing waiver of immunity from taxes. *See Lumbermens*, 654 F.3d at 1311 (explaining

---

[23]/ In effect, the County is caught in a catch-22 of sorts, caused by the incompatibility of the *Piamba Cortes* test with the exceedingly high and rigid standards that are applied to any waiver of sovereign immunity. The court cannot view the 2011 amendment as a clarification with retroactive effect unless the 1977 version of section 1323 was ambiguous in its scope. However, if the earlier version of section 1323 was in fact ambiguous, then the 2011 amendment cannot have retroactive effect because Congress did not waive the government's immunity from taxes by using clear and unambiguous language in 1977.

that a waiver of sovereign immunity must be "unequivocally expressed in statutory text and will be strictly construed, *in terms of its scope*, in favor of the sovereign") (citation and quotations omitted).

Finally, because it determined that the 2011 amendment was a clarification of an existing waiver, rather than a new waiver of immunity, the district court placed extensive weight on the legislative history of that amendment. However, as noted above, the 1977 version of section 1323 did not contain an unambiguous waiver of immunity from state and local taxes, so the 2011 amendment must be interpreted as a new waiver of sovereign immunity, the limitations of which were to be determined solely with reference to its express language. For that reason, the district court was not permitted to turn to the legislative history of the 2011 amendment in discerning its meaning. *See Cooper*, 132 S. Ct. at 1448 ("Legislative history cannot supply a waiver that is not clearly evident from the language of the statute."); *Lane*, 518 U.S. at 192 ("A statute's legislative history cannot supply a waiver that does not appear clearly in any statutory text.").

In summary, because the 1977 version of section 1323 did not clearly waive the government's immunity from state or local taxes, the 2011 amendment to that section must be treated as a new waiver of the government's sovereign immunity. The amendment cannot be treated as a clarification of an earlier waiver because such treatment would expand the waiver beyond the unambiguous language of section 1323 as it existed before the date of the amendment. This court cannot apply the new waiver contained in the 2011 amendment retroactively unless Congress expressly stated its intent to give the amendment retroactive effect. Neither the County nor amici argue that the amendment contains a new waiver of immunity that Congress intended to have retroactive effect, and the court does not discern any such intent in either the text or the history of the 2011 amendment.[24]

---

[24]/ The County and amici do not argue that the amendment contained a new waiver of sovereign immunity that Congress intended to have retroactive effect. *See* Pl.'s Resp. at 19 n.11 (stating that "[t]his Court need not apply the Stormwater Amendment retroactively in order to find in favor of DeKalb County"); Amicus Br. at 14 n.21 (noting that "this is not a case involving the retroactivity of [the 2011 amendment]"). Unless Congress uses clear terms to express its intent that a statute be applied retroactively, the statute will not be given such effect. *See Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 237 (1995) (noting that "statutes do *not* apply retroactively *unless* Congress expressly states that they do") (emphasis in original). There is no language in the 2011 amendment expressly indicating that Congress had intended it to apply retroactively, nor is such an intent visible in the legislative history of the amendment. Instead,

Because the 2011 amendment cannot be applied retroactively, the County may not recover the stormwater charges it seeks to collect in this case.

## CONCLUSION

The County's claims related to stormwater management charges assessed in the first half of 2005 accrued more than six years before this suit was filed and must be dismissed as untimely. The remaining claims seek to recover local taxes that were assessed against the federal government before Congress waived the government's immunity from such taxes; those claims must be dismissed for failure to state a claim upon which relief can be granted. Because the County's claims must be dismissed, the court cannot grant its motion for summary judgment on those claims. In accordance with the foregoing, it is hereby **ORDERED** that:

(1)     Defendant's Motion to Dismiss, filed February 27, 2012, is **GRANTED**;

(2)     Plaintiff's Motion for Partial Summary Judgment, filed April 30, 2012, is **DENIED**;

(3)     The Clerk's Office is directed to **ENTER** final judgment in favor of defendant, **DISMISSING** the complaint as follows:

   (a)     The claims related to stormwater utility charges billed to defendant before November 14, 2005, shall be dismissed under RCFC 12(b)(1), without prejudice; and

   (b)     The remaining claims in the complaint shall be dismissed under RCFC 12(b)(6), with prejudice.

(4)     No costs.

---

the amendment simply states that federal agencies are responsible for stormwater charges under section 1323, without regard to whether they are called fees or taxes. For that reason, the court may not apply the 2011 amendment retroactively to permit the County to recover the charges it seeks to collect in this case.

47

<u>/s/Lynn J. Bush</u>
LYNN J. BUSH
Judge